188 U.S. 375 (1903)
FRANCIS
v.
UNITED STATES.
No. 80.
Supreme Court of United States.
Argued December 15, 16, 1902.
Decided February 23, 1903.
CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SIXTH CIRCUIT.
Mr. John G. Carlisle and Mr. Miller Outcalt for petitioners.
Mr. William D. Guthrie's brief in No. 2 (p. 321, ante,) was also entitled in this action.
Mr. Assistant Attorney General Beck for the respondent argued and submitted the same brief as in Champion v. Ames, the Lottery Case, p. 321, ante.
MR. JUSTICE HOLMES delivered the opinion of the court.
This is an indictment under Rev. Stat. § 5440, for conspiring *376 to commit an offence against the United States. The offence which the defendants are alleged to have conspired to commit and to have committed is that of causing to be carried from one State to another, viz., from Kentucky to Ohio, five papers, certificates and instruments, purporting to be and to represent chances, shares and interests in the prizes thereafter to be awarded by lot in the drawings of a lottery, commonly known as the game of policy. Act of March 2, 1895, c. 191, 28 Stat. 963. It appears that the lottery in question had its headquarters in Ohio and agencies in different States. A purchaser, or person wishing to take a chance, went to one of these agencies, in this case in Kentucky, selected three or more numbers, wrote them on a slip, and handed the slip to the agent, in this case to the defendant Hoff, paying the price of the chance at the same time, and keeping a duplicate, which was the purchaser's voucher for his selection. The slip in this case was taken by the defendant Edgar to be carried to the principal office, where afterwards, in the regular course, there would be a drawing by the defendant Francis. If the purchaser's number should win, the prize would be sent to the agency and paid over. The carriage from one State to another, relied upon as the object of the conspiracy, and as the overt act in pursuance of the conspiracy, was the carriage by Edgar of slips delivered to Hoff, as above described. The case was sent to the jury by the District Court, the defendants were found guilty, and the judgment against them was affirmed by the Circuit Court of Appeals. Reilley v. United States, 106 Fed. Rep. 896. The case then was brought here on certiorari.
An exception was taken at every step of the trial in the hope that some shot might hit the mark. We entirely agree with the Circuit Court of Appeals in its unfavorable comments on the practice. But, little attention as most of the objections may deserve, they at least succeeded in raising the broad questions whether the act of 1895 is constitutional and whether the offence proved is within it. The former is disposed of by the case of Champion v. Ames, p. 321, ante, decided this day. The latter remains, and thus far seems to us not to have received quite sufficient notice.
*377 The game was played by mixing seventy-eight consecutive numbers and drawing out twelve after all the purchases for the game had been reported. If the three on any slip corresponded in number and order with three drawn out, the purchaser won. The purpose of bringing in the slips to headquarters was that all purchases should be known there before the drawing, and thus swindling by agents of the lottery made impossible. It is said by the Circuit Court of Appeals that the successful slips were returned with the prizes. If this is correct we do not perceive that it materially affects the case. The arrangement, whatever it was, was for the convenience and safety of those who managed this lottery, and was in no way essential to the interests of the person making the purchase or bet. The daily report of the result of the drawings to Hoff, with whom he dealt, and the forwarding of the prize, if drawn, filled all his needs. It would seem from the evidence, as the government contended  certainly the contrary does not appear and was not argued  that Hoff and Edgar, the carrier, were agents of the lottery company. Thus the slips were at home, as between the purchaser and the lottery, when put into Hoff's hands. They had reached their final destination in point of law, and their later movements were internal circulation within the sphere of the lottery company's possession. Therefore the question is suggested whether the carriage of a paper of any sort by its owner or the owner's servant, properly so-called, with no view of a later change of possession, can be commerce, even when the carriage is in aid of some business or traffic. The case is different from one where, the carriage being done by an independent carrier, it is commerce merely by reason of the business of carriage.
The question just put need not be answered in this case. For on another ground we are of opinion that there was no evidence of an offence within the meaning of the act of 1895. The assumption has been that the slips carried from Kentucky to Ohio were papers purporting to be or represent a ticket or interest in a lottery. But in our opinion these papers did not purport to be or do either. A ticket, of course, is a thing which is the holder's means of making good his rights. The essence of *378 it is that it is in the hands of the other party to the contract with the lottery as a document of title. It seems to us quite plain that the alternative instrument mentioned by the statute, viz., a paper representing an interest in a lottery, equally is a document of title to the purchaser and holder  the thing by holding which he makes good his right to a chance in the game. But the slips transported, as we have pointed out, were not the purchaser's documents. It is true that they corresponded in contents, and so in one sense represented or depicted the purchasers' interests. But "represent" in the statute means, as we already have said in other words, represent to the purchaser. It means stand as the representative of title to the indicated thing  and that these slips did not do. The function of the slips might have been performed by descriptions in a book, or by memory, if the whole lottery business had been done by one man. They as little represented the purchasers' chances, as the stubs in a check book represent the sums coming to the payees of the checks.
We assume for purposes of decision that the papers kept by the purchasers were tickets or did represent an interest in a lottery. But those papers did not leave Kentucky. There was no conspiracy that they should. We need not consider whether, if it had been necessary to take them to Ohio in order to secure the purchasers' rights, the lottery keepers could be said to conspire to cause them to be carried there, when the carriage would be in an interest adverse to theirs, and they would be better off and presumably glad if the papers never were presented. See Commonwealth v. Peaslee, 177 Massachusetts, 267, 271; Graves v. Johnson, 179 Massachusetts, 53, 58.
The judgment of the Circuit Court of Appeals is reversed; the judgment of the District Court is also reversed and the cause remanded to that court with directions to set aside the verdict and grant a new trial.
MR. JUSTICE HARLAN dissenting.
This is a criminal prosecution based upon the first section of the act of Congress of March 2, 1895, c. 191, entitled "An act *379 for the suppression of lottery traffic through national and interstate commerce and the postal service subject to the jurisdiction and laws of the United States."
That section reads: "§ 1. That any person who shall cause to be brought within the United States from abroad, for the purpose of disposing of the same, or deposited in or carried by the mails of the United States, or carried from one State to another in the United States, any paper, certificate, or instrument purporting to be or represent a ticket, chance, share, or interest in or dependent upon the event of a lottery, so-called gift concert, or similar enterprise, offering prizes dependent upon lot or chance, or shall cause any advertisement of such lottery, so-called gift concert, or similar enterprises, offering prizes dependent upon lot or chance, to be brought into the United States, or deposited in or carried by the mails of the United States, or transferred from one State to another in the same, shall be punishable in the first offence by imprisonment for not more than two years or by a fine of not more than one thousand dollars, or both, and in the second and after offences by such imprisonment only." 28 Stat. 963.
The indictment charges a conspiracy to commit the offence denounced by that section.
Judge Severens, delivering the judgment of the Circuit Court of Appeals, thus stated, and I think accurately, the result of certain evidence on the part of the Government: "Upon the trial the Government offered evidence tending to prove that the respondents adopted a scheme of lottery business called by them `policy,' which they subsequently carried into operation, of the character following: The principal office for the transaction of the business was located in a building in Cincinnati, Ohio. The place where the drawings of numbers from a wheel were made was located in another building or room adjoining the principal office and connected with it by a private way. In various places in that city and elsewhere, in Ohio and other States, one, at least, being in Newport, Kentucky, they had offices or stations at which the patrons purchased tickets or chances in the drawings to be thereafter made in Cincinnati, at the place mentioned. Successive numbers from one to seventy-eight, inclusive, were each day *380 put into the wheel, and at each drawing twelve numbers were taken out. A list of these twelve numbers was taken into the principal office and there recorded. Several hours in the day before these drawings respectively took place, the patrons purchased chances at the sub-offices or stations from an agent of the respondents, or from one of the latter, in charge at that place. In this instance the purchase was made of the respondent Hoff at the Newport office. The purchaser (Harrison, in this instance) chose three of the numbers from one to seventy-eight, inclusive, and wrote them upon a slip of paper, of which, according to the method of doing business, he kept a duplicate. He handed his list of numbers, with figures to denote the sum paid, upon a slip of paper, and the money to pay for his chance, to the person in charge to be transmitted to the principal office in Cincinnati, by the `carrier,' who would call to take them up. When these slips and the moneys were all brought into the principal office, the drawing above mentioned took place. If the three numbers on the slip were of the twelve drawn from the wheel, the purchaser would win the prize, $200, when the game (of which there were several forms) was played on the basis above stated. If not, he lost. A report of the drawings was sent back to the station from which the slip came, and if any purchaser had made a `hit' his slip would be returned with the prize to be there delivered to him. Of the respondents, Reilley was in charge of the principal office, Francis of the drawings, Hoff of the station in Newport, as already stated, and Edgar was the carrier. The slip of paper taken by the carrier represented the interest of the purchaser of the chance, and, although containing figures only, it had a definite meaning and was understood by all the parties concerned. It was the transportation of some of such lists, one being that of Harrison, from Newport, Kentucky, to Cincinnati, Ohio, with knowledge of their character that constituted the overt act done in pursuance of the conspiracy." That the counsel for the accused held the same view of the evidence is shown in an extract from their brief printed in the margin.[1]
*381 I. The act of March 2, 1895, c. 191, was under examination by this court in France v. United States, 164 U.S. 676. That was an indictment for a conspiracy to violate its first section. The judgment of conviction in that case was reversed upon the ground that the evidence showed that the papers and instruments which the defendants caused to be carried from Kentucky to Ohio did not relate to a lottery to be thereafter drawn, but to one that had previously been drawn. The court said: "There is no contradiction in the testimony, and the Government admits and assumes that the drawing in regard to which these papers contained any information had already taken place in Kentucky, and it was the result of that drawing only that was on its way in the hands of messengers to the agents of the lottery in Cincinnati. The statute does not cover the transaction, and however reprehensible the acts of the plaintiffs in error may be thought to be, we cannot sustain a conviction on that ground. Although the objection is a narrow one, yet the statute being highly penal, rendering its violator liable to fine *382 and imprisonment, we are compelled to construe it strictly. Full effect is given to the statute by holding that the language applies only to that kind of a paper which depends upon a lottery the drawing of which has not yet taken place, and which paper purports to be a certificate, etc., as described in the act. If it be urged that the act of these plaintiffs in error is within the reason of the statute, the answer must be that it is so far outside of its language that to include it within the statute would be to legislate and not to construe legislation."
No such point can be made in this case, because the indictment presents a case within the provisions of the statute as interpreted in France v. United States; for it refers to papers and instruments relating to a lottery thereafter to be drawn. Besides, there was evidence tending to show that the papers and instruments which the defendants were charged to have caused to be carried from Kentucky to Ohio had reference to a future drawing and not to one that had already occurred. And the trial judge, after stating the facts, said to the jury: "Did these papers, or so-called lottery tickets, which it is alleged defendants conspired to carry from Kentucky to Ohio, purport to represent interests of players in a drawing afterwards to take place? It is not necessary, gentlemen, that they should purport or show upon their face that they were tickets in a lottery giving an interest to the holder, in a drawing afterwards to take place, but their purport may be shown outside of the papers. Now, as to the evidence offered by the Government upon that point, you will recall the evidence of France, who was introduced as an expert, to tell what they were, and the evidence of Harrison, that he wrote out his ticket and delivered one half of it to the agent, paid his money and held the duplicate  one of the duplicates, his evidence of the interest he had in the drawing that was to come off that day, and the evidence to which I have before referred as to the fact that the duplicate left with Hoff was afterwards found in possession of Edgar at the end of the bridge shortly after the play was made. If, from these facts you are satisfied that it represented an interest in the drawings afterwards to take place then, within the meaning of the law, it purported to represent the interest of the *383 player in the drawing, although it did not so state upon its face."
II. In Champion v. Ames, p. 321, ante, this day decided, it has been held that lottery tickets were subjects of traffic among those who choose to sell or buy them; that the carriage of such tickets by independent carriers from one State to another was therefore interstate commerce; that under its power to regulate commerce among the several States, Congress  subject to the limitations imposed by the Constitution upon the powers granted by it  has plenary authority over such commerce, and may prohibit the carriage of such tickets from State to State; and that legislation to that end and of that character is not inconsistent with any limitation or restriction imposed by the Constitution upon the exercise of the powers granted to Congress.
Here, there was no carrying of lottery tickets from Kentucky to Ohio by an independent carrier engaged in the transportation, for hire, of freight and packages from one State to another. But the carrying was by an individual acting in pursuance of a conspiracy between himself and others that had for its object the carrying from Kentucky to Ohio of certain papers or instruments representing a chance, share or interest in or dependent upon the event of a lottery, thereafter to be drawn, which offered prizes dependent upon lot or chance. Those who were parties to the conspiracy were, in effect, partners in committing the crime denounced by the above act of Congress; and the act of one of the parties in execution of the objects of such conspiracy was the act of all the conspirators.
The judgment therefore should be affirmed, unless it be that the carrying of lottery tickets from one State to another by an individual, acting in cooperation with his co-conspirators, is not interstate "commerce." But is it true that the "commerce among the several States," which Congress has the power to regulate, cannot be carried on by an individual, or by a combination of individuals? We think not. In Paul v. Virginia, 8 Wall. 168, 183, the court, referring to the grant to Congress of power to regulate commerce among the several States, said: "The language of the grant makes no reference to the instrumentalities *384 by which commerce may be carried on; it is general, and includes alike commerce by individuals, partnerships, associations, and corporations." In Welton v. State of Missouri, 91 U.S. 275, 280, it was said that the power to regulate commerce embraces "all the instruments by which such commerce may be conducted." That the commerce clause of the Constitution embraces alike commerce by individuals, partnerships, associations and corporations was recognized in Pensacolo Tel. Co. v. Western Union Tel. Co., 96 U.S. 1, 21. And in Gloucester Ferry Co. v. Pennsylvania, 114 U.S. 196, 205, the court said that commerce among the States "includes commerce by whomsoever conducted, whether by individuals or by corporations."
In Champion v. Ames the carrying of lottery tickets happened to be by an incorporated express company. But if it had been by an express company organized as a partnership or joint stock company the result of the decision could not have been different. In this case, if the carrying had been by an ordinary express wagon, owned by a private person, but employed by the accused and other conspirators to carry the lottery papers in question from Kentucky to Ohio, surely the carrying in that mode would be commerce within the meaning of the Constitution. It cannot be any less commerce because the carrying was by an individual who, in conspiracy or cooperation with others, caused the carrying to be done in violation of the act of Congress. The learned counsel for the accused, referring to the legislation enacted prior to 1895, which had for its object to exclude lottery matter from the mails, and to prohibit the importation of lottery matter from abroad, says: "In 1895 the act now in question was passed, supplementing the provisions of the prior acts so as to prohibit the act of causing lottery tickets to be carried and lottery advertisements to be transferred from one State to another by any means or methods."
It seems to me that the evidence made a case within the act of Congress, and that no error of law was committed by the trial court. The papers carried from Kentucky to Ohio were of the class described in the act, "any paper, certificate, or instrument *385 purporting to be or represent a ticket, chance, share, or interest in or dependent upon the event of a lottery, so-called gift concert, or similar enterprise, offering prizes dependent upon lot or chance." The paper or instrument carried from Kentucky to Ohio, of which the purchaser had a duplicate, certainly represented, to all the parties concerned, a chance, or interest dependent upon an event of a lottery or "similar enterprise," offering prizes dependent upon a lot or chance. To hold otherwise is to stick in the bark. It informed the policy gambler, if a prize was drawn, that the person who held the duplicate was entitled to the prize, and it was therefore a paper the carrying of which from one State to another made the conspirators causing it to be so carried, guilty of an offence under the act of Congress. The reasoning by which the case is held not to be embraced by the act of Congress is too astute and technical to commend itself to my judgment. It excludes from the operation of the act a case which, as I think, is clearly within its provisions.
NOTES
[1] "In the Francis case, now before the court, it was shown that the principal office of the `policy' concern was located in Cincinnati, Ohio, that the drawings took place in an adjoining building or room, and that sub-offices or agencies were maintained in various places in that city and in other cities in Ohio and other States, at which patrons or players would select numbers in the drawings to be made in Cincinnati. One desiring to play such a game would choose three of the numbers from 1 to 78 inclusive, and write them upon a slip of paper, of which he kept a duplicate. He would hand his list of numbers, with figures to denote the sum paid, together with the money to pay for his chance, to the person in charge of the sub-office or agency to be transmitted to the principal office in Cincinnati. When these slips and the moneys were brought to the principal office, the drawing took place. Successive numbers from 1 to 78 inclusive were put into a wheel, and at each drawing twelve numbers were taken out. If the three numbers on the slip were of the twelve drawn from the wheel, the purchaser would win a prize. If not, he lost. A report of the drawings was sent back to the agency from which the slip came, and, if any purchaser had won a prize or, as it is termed, made a `hit,' his slip was returned with the prize to be there delivered to him. In the instance shown by the testimony, the selection was made by the witness Harrison at the Newport office. The defendant Reilley was claimed to be in charge of the principal office in Cincinnati, Francis in charge of the drawings, and Hoff in charge of the station in Newport. Edgar carried the slips from Newport to Cincinnati, and this carriage of the slips constituted the alleged overt act done in pursuance of a comspiracy in violation of the act of Congress."