### FORTE v. UNITED STATES.
### No. 6449.

United States Court of Appeals for the District of Columbia.

Decided April 6, 1936.

Charles E. Ford and Milton Kaplan, both of Washington, D. C., for appellant.

Leslie C. Garnett and Roger Robb, both of Washington, D. C., for the United States.

Before MARTIN, Chief Justice, and VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

VAN ORSDEL, Associate Justice.

The appellant Forte, together with three others, was convicted in the Supreme Court of the District of Columbia of the sale and possession of lottery tickets in violation of section 863 of the District of Columbia Code 1901, as amended, 32 Stat. 535 (D.C.Code 1929, T. 6, § 151). He alone appeals.

It appears from the evidence that on November 30, 1934, about noon, one Melvin M. Kite, a police officer attached to the gambling squad, went to a lunchroom located at 1101 Fifth Street Northwest, in the city of Washington, and made a play on the so-called "numbers game" with one Nicholas Jimroglou, who had a numbers book lying on the counter. On December 6th following, Kite made another play on the numbers with Nicholas in these premises. Upon this occasion William Jimroglou, brother of Nicholas, was also present. Kite testified that on this occasion he saw both Nicholas and William "writing numbers" for other persons. On December 21st following, Kite again went to these premises. Upon this occasion he again saw Nicholas and William, and also one Bethea. Nicholas told William to take care of Kite, and Kite then made a play on the numbers game with William. On December 24th Kite again went to these premises, where he found Nicholas and Bethea and made a play on the numbers with Nicholas. Kite testified that on this occasion Forte entered the lunchroom and Nicholas turned over to him the numbers slips. Forte then went out of the lunchroom, got into an automobile, and drove away. There was no conversation between Nicholas and Forte on this occasion. On December 29th Kite again went to the lunchroom and found

Nicholas and Bethea present. Nicholas told Bethea to take care of Kite, whereupon Kite made a play on the numbers with Bethea. Following this transaction, Kite swore to a warrant in the police court, charging Nicholas with setting up a gaming table in violation of section 865 of the District of Columbia Code, 1901 (D.C.Code 1929, T. 6, § 153).

About 1:00 p. m. on January 3, 1935, Kite again went to the lunchroom, having been given two marked nickels by Sergeant Deyoe of the gambling squad. He was accompanied by Deyoe and two other police officers. Deyoe had with him the warrant which Kite had procured for the arrest of Nicholas. As Kite went into the lunchroom, he saw appellant Forte enter ahead of him, and observed Nicholas hand an envelope to Forte. Kite then walked up to the counter and told Nicholas that he wanted 'to make a play on the numbers, whereupon Forte handed the envelope back to Nicholas, who then wrote up the play, gave Kite his receipt slip, and put another slip into the envelope, which he then handed to Forte. Forte put the envelope in his pocket and walked out. Kite gave the marked nickels to Nicholas, who placed them in a bowl behind the counter. Kite then signaled the other officers, who were waiting, and then arrested Forte as he was about to enter his automobile. Kite searched Forte and found on him a quantity of numbers slips and some money, and also the aforementioned envelope, on which was written, "M 231 City Lunch, 1101 5th St., N. W.—$3.11," and which contained the original slip which Nicholas had just written on the play which he (Kite) made in the lunchroom. This original slip was compared with Kite's duplicate slip in Forte's presence, and the two slips were called to Forte's attention.

The officers searched the automobile and found a package containing a large quantity of numbers slips. The officers entered the lunchroom immediately after the arrest of Forte and executed the warrant for the arrest of Nicholas. When Nicholas was arrested, he was holding in his hand a numbers book which was found to contain a carbon copy of the original numbers slip recovered from Forte, the other carbon copy of which had been given to Kite on his play with the marked money. The lunchroom was then searched, and seventeen new numbers books were found underneath the counter. Numbers books were

also found which contained carbon copies of other original slips taken from Forte. In the bowl behind the counter, among a quantity of coins, the officers found the marked nickels which had been given Kite to make a play. Forte admitted that he was working for a man named Sowers, that he went to certain places to "pick up numbers," and that he turned them over to another man.

Forte did not take the stand. The only evidence offered on behalf of any of the defendants was the testimony of the two Jimroglous that the name of the man identified by the police officers as Nicholas was in reality William.

The evidence as to these transactions shows conclusively that appellant and his codefendants were engaged in conducting the "numbers game." The principal question for our decision is whether or not this game, as described by the police officers at the trial, comes within the purview of section 863 of the District of Columbia Code prohibiting, inter alia, the sale and possession of lottery tickets—in other words, whether the "numbers game" is a lottery. This section, which is captioned "Lotteries," provides as follows: "If any person shall within the District keep, set up, or promote, or be concerned as owner, agent, or clerk, or in any other manner, in managing any policy lottery or policy shop, or shall sell or transfer any ticket, certificate, bill, token, or other device purporting or intended to guarantee or assure to any person or entitle him to a chance of drawing or obtaining a prize, to be drawn in any lottery, or in the game or device commonly known as policy lottery or policy, or shall, for himself or another person, sell or transfer, or have in his possession for the purpose of sale or transfer, or shall aid in selling, exchanging, negotiating, or transferring a chance or ticket in or share of a ticket in any policy lottery or any such bill, certificate, token, or other device, he shall be fined not more than five hundred dollars or be imprisoned not more than three years, or both."

The indictment is in eight counts. The first six counts are identical, except for the dates alleged. These six counts charge the defendants with the unlawful sale and transfer to Kite of "a certain ticket, certificate, bill, token and device purporting and intended to guarantee and assure to, and entitle the said Melvin M. Kite to a chance

of drawing and obtaining a prize, to be drawn in a certain lottery, a more particular description whereof is to the Grand Jurors aforesaid unknown." The seventh count charges the defendants with unlawfully having in their possession, for the purpose of sale and transfer, "a chance and ticket in a certain policy lottery, a more particular description whereof is to the Grand Jurors aforesaid unknown." The eighth count charges the defendants with the unlawful possession, for the purpose of sale and transfer, of "a certain ticket, certificate, bill, token, and device, purporting and intended to guarantee and assure to the purchaser thereof a chance of drawing and obtaining a prize, to be drawn in a certain lottery, a more particular description whereof is to the Grand Jurors aforesaid unknown."

The appellant was found not guilty on the first, second, third, and fourth counts, guilty on the fifth, sixth, and eighth counts, and not guilty by direction of the court on the seventh count.

It is the contention of counsel for appellant that the so-called "numbers game," as described in the evidence adduced at the trial of this case, is not a lottery within the purview of section 863. The trial court charged the jury on this point as follows: "I say to you that if the numbers game was played in the way in which they described, then it did constitute a lottery, within the meaning of this statute which I have referred to."

We think the court correctly stated the law. It appears from the testimony that the numbers game is played in the following manner: The player gives the numbers writer a number containing three digits and bets his money, from a penny up, on this number. The numbers writer writes the number and the amount which the player wants to play in a small book which produces an original and two carbon copies. He then gives the player one of the carbon copies. One of the other two impressions is later picked up and turned over to the backer. The third copy is kept by the writer. Sometimes the writer places his initials and the initials of the player on the slip, together with the total amount of the bet. The winning number is determined each day by the results of the first three races at a certain race track. To make this determination, "you take the aggregate in each race of the prices paid for first, second, and third; then you take

the first digit to the left of the decimal in each aggregate, and you put those digits down in order, from left to right, and that forms the winning number for that day's numbers game." If the number selected proves to be correct, the player wins six hundred times the amount of his bet, payable in money, less a runner's charge; the runner being the man who picks up the slips for the backer. The winnings are collected from the numbers writer upon presentation of the duplicate slip, which is the player's receipt.

The question raised is a novel one in this District, but it has been considered by a number of state courts. See Commonwealth v. Banks, 98 Pa.Super. 432, 436.

The first contention of counsel for appellant is that the numbers game is a direct bet or wager on horse races. This contention has been generally rejected by the courts. Commonwealth v. Wright, 137 Mass. 250, 50 Am.Dec. 306; Wilkinson v. Gill, 74 N.Y. 63, 67, 30 Am.Rep. 264; Commonwealth v. Banks, supra. The results of the horse races are employed merely to determine the winning number, it being entirely immaterial to the player of the numbers game which horses win. The player merely guesses that the result of mathematical calculations, based upon the prices paid at a certain track, will be a certain number.

▮ It is further contended that the numbers game is not a lottery because there must be a physical drawing of the certificate or ticket. One of the essential elements of a lottery is the awarding of a prize by chance, but the exact method adopted for the application of chance to the distribution of prizes is immaterial. People v. Elliott, 74 Mich. 264, 41 N.W. 916, 3 L.R.A. 403, 16 Am.St.Rep. 640; 38 C. J. pp. 289, 290, § 3. Any reasonable interpretation of the statute indicates that it is the prize and not the ticket which is to be drawn. The language of the statute is "any ticket * * * or other device purporting or intended to guarantee or assure to any person, or entitle him to a chance of drawing or obtaining a prize, to be drawn in any lottery, or in the game or device commonly known as policy lottery or policy." (D.C.Code 1929, T. 6, § 151.)

In our opinion the "numbers game" is a lottery.

▮ Appellant's contention that the prohibition of the statute is limited to the so-called "policy game" cannot be sustained. We think that section 863, which is captioned "Lotteries," is broad enough in its scope to prohibit the sale, transfer, or possession of any ticket intended to assure a chance of obtaining a prize "to be drawn in any lottery." While it may have been the intent of the Congress chiefly to suppress the policy game, which was prevalent at the time of the enactment of this statute, there is nothing to indicate that the prohibition is limited to this one type of lottery. On the contrary, the statute covers broadly any form of lottery.

A similar contention was made in the case of Commonwealth v. Banks, supra, wherein the defendant was prosecuted, under a state law prohibiting lotteries generally, for operating the "numbers game." In the course of its opinion the court said (98 Pa.Super. 432, at pages 433, 434): "He argues that as the Act of February 17, 1762 (1 Sm.L. 246), forbade 'lotteries' in much the same terms as the Act of 1860, the term must be limited to such forms of lottery as were then known and legislated against and cannot be applied to a scheme not then in existence. Practically the same contention was made as long ago as 1818 and decided adversely to the appellant. In Seidenbender v. Charles' Adm'rs, 4 Serg. & R. 151, 164 [8 Am.Dec. 682], Judge Gibson said on this point: 'I grant the legislature may not have had this particular kind of lottery in view, but was it intended to restrain the operation (of the Act of 1762) to those particular kinds of lotteries then in use, and to those only? I apprehend not. It is very clear that a particular kind of mischief, differing not in form or substance, but in degree only from the one under consideration, and only less pernicious in its consequences, first induced the legislature to act on the subject. Shall the letter, which is sufficiently comprehensive to embrace this case, be restrained to the particular mischief then existing, and exclude one of the very same stamp, merely because it was not then practiced? This surely would not be a sound construction. * * * We are bound to extend it to every case within the letter, which we can suppose would, if foreseen, have been specially provided for.'"

▮ The policy game is undoubtedly a lottery (Wilkinson v. Gill, supra; People v. Elliott, supra), and in our opinion the operation of that game, and the sale, transfer, and possession of policy tickets, could

be punished under section 863 even had that particular type of lottery not been prohibited eo nomine in the statute. The principal differences between the policy game and the numbers game are that in the policy game the player must choose numbers between 1 and 78, instead of any number of three digits, as in the numbers game, and that the winning number in the policy game is determined by drawing from a wheel, while in the numbers game it is determined by a computation upon prices paid at race tracks. The fundamental point is that in each case there is the offering of a prize, the giving of a consideration for an opportunity to win the prize, and the awarding of the prize by chance. 38 C.J. 289, § 2.

■ Appellant next contends that numbers slips are not lottery tickets under the decision of the Supreme Court of the United States in Francis v. United States, 188 U.S. 375, 23 S.Ct. 334, 336, 47 L.Ed. 508. The statute involved in the Francis Case prohibited, among other things, the causing to be carried in interstate commerce of "any paper, certificate, or instrument purporting to be or represent a ticket, chance, share, or interest in or dependent upon the event of a lottery." The defendants were convicted of conspiring to transport certain papers, alleged to purport to be or represent a ticket or interest in a lottery, from Kentucky to Ohio. It appeared that these papers were the original slips, which were retained by the "policy writer." The player was given a duplicate. The court held that the duplicate was the paper representing the player's interest in the lottery, and that the original slips "as little represented the purchaser's chances as the stubs in a check book represent the sums coming to the payees of the checks."

Conceding that the original numbers slips which were turned over to appellant Forte were not lottery tickets, yet the duplicates which were handed over to Kite were unquestionably tickets intended to assure him of a chance of obtaining a prize to be drawn in a lottery.

■ The evidence clearly shows that the operators of this lunchroom were operating the numbers game, and that on January 3, 1935, Nicholas Jimroglou had in his possession, for purposes of sale and transfer, and did actually sell and transfer to Officer Kite, a lottery ticket—a duplicate numbers slip—and this in the presence of Forte, who then received the original slip from Nicholas. In our opinion the conduct of appellant upon this occasion and on December 24th was sufficient to justify the jury in inferring that he was engaged in a common criminal enterprise with the operators of this lunchroom and was a party to the illegal transactions therein conducted.

We have considered the other points raised by appellant, but find them to be without merit.

The judgment is affirmed.

ROBB, Associate Justice, took no part in the consideration or decision of this case.