364 F.2d 107
 UNITED STATES of America
v.
Murray B. BAKER and Victor O. Gates, Sr. Murray B. Baker, Appellant.
UNITED STATES of America
v.
Murray B. BAKER and Victor O. Gates, Sr. Victor O. Gates,
Sr., Appellant.
 Nos. 15572, 15573.
 United States Court of Appeals Third Circuit.
 Argued Feb. 10, 1966.
Decided July 28, 1966, Rehearing Denied Aug. 25, 1966.
 
 Allen M. Mesirow, Washington, D.C., for appellants.
 Bernard J. Brown, U.S. Atty., Scranton, Pa., for appellee.
 Before McLAUGHLIN, FORMAN and GANEY, Circuit Judges.
 OPINION OF THE COURT
 GANEY, Circuit Judge.
 
 
 1
 Appellants were indicted under a three-count indictment. The first two were under sections 1953(a) (interstate transportation of wagering paraphernalia) and 2 (aiding and abetting) of the Criminal Code, 18 U.S.C.A. 1953(a) and 2. The third count charged them with conspiring to commit the crimes set forth in the first two counts in violation of 371, the general conspiracy section of the Code. Before trial appellants moved to suppress the use as evidence, books of lottery tickets seized by State officers on January 8, 1963, from the premises of the Industrial Press located in the Telegraph Building, and on February 7, from a one-story garage, in Harrisburg, Pennsylvania. The ground for the motion was that the seizures, though pursuant to search and seizure warrants, were unreasonable. A hearing was held on May 4, 1964, and the motion was denied two days later. When the case was called for trial, appellants waived their right to trial by jury and agreed that the court decide their case upon a stipulation of facts. They also renewed their motion to suppress. The court, in an opinion, again denied the motion to suppress, denied their motion for judgment of acquittal and found each of the appellants guilty on all three counts of the indictment. 241 F.Supp. 272 (M.D.Pa.1965). Each appellant has appealed separately. We treat both appeals as though they were one.
 
 
 2
 Appellants admit they shipped lottery tickets into interstate commerce, and caused them to be shipped in that commerce, that the tickets were to be used in a lottery to be operated in the Republic of Haiti and that the winning buyer or buyers of those tickets at two dollars each were to be determined from the position in which horses finished in The International horse race held at Laurel, Maryland, in November, 1962. The lottery was to be patterned after the Irish Sweepstakes. That is, a number of counterfoils or ticket stubs were to be drawn at random or pure chance from a wheel, the quantity of which would have been equal to the number of horses entered in The International. Each of those stubs would have then been assigned a name of one of the horses, all the names being used in the process. This process was to have been repeated, the number of repetitions depending on the number of tickets sold.[1] The position of the first three horses at the end of the race would have determined the winning stubs. The person holding a ticket matching a stub bearing the name of a horse which ran first, second or third would have been the winner of the first, second or third prize respectively.
 
 
 3
 Because the lottery for which they printed the tickets would have been legal under a statute of the Republic of Haiti, the country where the lottery was to be operated, appellants contend that 1953(a) did not apply to their shipments by reason of subsection (b). This subsection provides in pertinent part: '(b) This section shall not apply to * * * (2) the transportation of betting materials to be used in the placing of bets or wagers on a sporting event into a State in which such betting is legal under the statute of that State * * *.' The shipments in question do not come within this subsection for two reasons: One, the lottery tickets were no more 'betting materials to be used in the placing of bets or wagers on a sporting event' than are the materials used in a numbers game. See for example Forte v. United States,65 App.D.C. 355, 83 F.2d 612, 615, 105 A.L.R. 300 (1936). And two, the word 'State', as used in the subsection and as the district court took great pains to point out (241 F.Supp. at 278-280), means one of the United States, and not a country in the international sense. See United States ex rel. Champion v. Ames, 95 F. 453 (C.C.N.D.Ill., 1899), where the court refused to construe the word State in a statute (upon which 1301 of Title 18 is derived) prohibiting the transportation of lottery tickets between States to include a territory of the United States.
 
 
 4
 In the alternative, appellants argue that to construe subsection (b) as we have, would make it unconstitutional. The reason asserted is that the subsection would then treat two acts differently when there is in fact no difference between them. If we assume for the purposes of argument that the acts are the same, appellants have failed to demonstrate that any lack of uniformity in treatment by the subsection is inappropriate to any proper legislative purpose. See Boylan v. United States, 310 F.2d 493, 500 (C.A.9, 1962).
 
 
 5
 Appellants assert a number of grounds as to why the district court erred in refusing to allow their motion to suppress evidence of the lottery tickets.[2] The printing of the lottery tickets by appellants was illegal.[3] They concede this much by admitting that the characteristics of the lottery which was to be conducted with those tickes are similar to those of a wagering pool based on the outcome of a sporting event. Consequently the tickets were subject to a reasonable search and seizure. But this fact does not convict them of the crime charged in the indictment. The prosecution must still have proved them guilty with relevant evidence which was both admissible and sufficient to meet the charge in the indictment. Since evidence of the lottery tickets and related items at least contributed to the conviction, it becomes necessary for us to determine whether that evidence should have been suppressed. Upon our independent examination of the evidence in the record,[4] we are satisfied that the district court did not err in denying the motion to suppress.
 
 
 6
 Appellants next contend, and this is their main point, that the stipulation of facts is insufficient to prove the crime set forth in each count of the indictment. Except for the dates on which the shipments of lottery books are asserted to have occurred, Counts I and II are identical. In substance these counts charge that the appellants did willfully transport and cause others to transport lottery books in interstate commerce knowing that they were to be 'adapted, designed and devised for use in a numbers, policy, bolita or similar game based upon the outcome of a sporting event.' Appellants maintain that the lottery for which the books of tickets were printed is not the same as or similar to the games of numbers, policy or bolita.[5]
 
 
 7
 A lottery is a scheme for the distribution of a prize or prizes by lot or chance, the number and value of which is determined by the operator of the lottery. The simplest form of which is the well-known raffle wherein a prize is awarded to the person holding the ticket, the number or name upon which corresponds responds to that on the counterfoil or ticket stub drawn at random from a container in which have been placed the stubs of all the tickets distributed. A ticket, often referred to as a chance, is usually sold for a fixed price to the buyer. Unless limited by the operator of the raffle, the buyer may purchase as many chances as he wishes. And unless the prize is made proportional to the number of tickets sold, the value of the prize awarded is independent of the number of chances purchased by any individual even though the odds of his winning the prize may be increased thereby. There is of course the possibility that receipts from sales will not cover the amount of the prizes and expense of operating the raffle. But if such a possibility does occur, the operator can call the raffle off and return the amounts paid for the tickets sold. This, however, is so rare an event, the operator can be said to be the holder of a wagering pool, paying out the prizes from the pool, and pocketing the remainder less expenses. Hence a raffle is a convenient way of raising money by the operator. When the sale of chances is not limited to any locale and a formula is used for determining the winning ticket, the scheme is referred to as a lottery, such as the one which was to be conducted here.
 
 
 8
 In contrast, 'numbers' or the numbers game is that game wherein the 'player' wagers or plays that on a certain day a certain series of digits will appear or 'come out' in the series, such as the United States Treasury balance or parimutuel payoff totals of particular races at a certain racetrack for the day,[6] used as a reference. Though the number of digits is fixed, usually at three, any player is free to select any number or quantity of numbers within the range of those digits, and designate the amount of his wager upon each. Thus, it is possible for a number of people to play the same number while other numbers go unplayed. The probability odds, for example, of predicting that a certain three digit number will come out is a thousand to one. However, the person known as the backer or 'banker', who guarantees the payoffs to the successful player or players, predetermines the rate of the payoffs, which in most instances is pitifully less than the true odds. In such a game neither the number of winning players nor the total amount of the payoffs can be predicted in any one day. Thus, in a single day it is possible for the payoffs to be larger than the total sum wagered. On the other hand at the other extreme it is possible to have no payoffs because no one played the number that came out.[7]
 
 
 9
 Policy and bolita differ from the numbers game in the method of determining the winning sequence or combination of digits. In policy, it is ascertained by the drawing at random from a wheel in which tags, each bearing one of the possible combinations of numbers that can be played, have been placed. The game is sometimes played in conjunction with a lottery, the winning combination of numbers being taken from the end digits of the number printed on the winning ticket drawn in the lottery. 38 C.J.S. Gaming 1, pp. 41-42; 54 C.J.S. Lotteries 10, p. 856. Bolita is different from policy in that the numbers which may be played are restricted to two digits.[8] The name bolita is the diminutive of ball in Spanish.[9] Originally, and perhaps in some localities today, the winning number combination was ascertained by the drawing of one of the balls at random from two bags each containing ten little balls numbered from 'o' to '9'.
 
 
 10
 More specifically, appellants say that the characteristics of numbers, policy and bolita, which they claim do not apply to lottery, are well-known, and are as follows: (1) The player selects the number upon which he will wager; (2) The player designates the amount of his wager; (3) The rate of the payoff is predetermined by the backer; and (4) The risk of the wager is borne by the backer.
 
 
 11
 Granted that the first three characteristics exist, we think there are similarities, taking into account the way the numbers game is played, between the lottery in question and policy, one of the numbers games set forth in the indictment.[10] It must be remembered that the numbers game is played almost every weekday of the year, while the lottery here was to be a single event which could have taken place but once in a year's time. If one were to record over a year's time, the gross profit made by the backer of a numbers game, it will be found that its percentage of the total amount played would approximate the percentage of the difference between the rate of the payoff to winning players and the true rate. Because of the great disparity between rate of payoff and the true rate, the risk of a backer losing money on payoffs alone over a year's time is practically nil. Thus, the backer is like the holder of a wagering pool, taking his percentage of the amount wagered for his troubles and returning the remainder to the successful players. In this respect there is no difference between the backer and the operator of a lottery. Since the backer is almost assured of a return, the players in effect are not wagering against him, but against each other as in a lottery.
 
 
 12
 Moreover in the lottery which was to be operated here, since each of the lottery tickets bears a serial number different from the others, each buyer of a ticket would have wagered the other buyers that his ticket stub would be drawn and win a prize according to the method which was to be used to determine the winning ticket. Therefore, each buyer would have wagered that a stub bearing that number, whatever it may have been, would at least the drawn. This is the way the policy game is sometimes played.
 
 
 13
 We think these similarities are sufficient to bring the proof in harmony with each count of the indictment.
 
 
 14
 Accordingly, the judgment of conviction and sentence regarding the appellant in each case will be affirmed.
 
 
 
 [1]
 The reverse side of each lottery ticket printed by appellnts contained the following information:
 DISTRIBUTION: The amount of money received from the sale of tickets for the Republic of Haiti Welfare Fund Sweepstakes will be distributed percentagewise.
 
 
 [10]
 percent and 15 percent of the funds will be used for the establishment over the territory of the Republic of Haiti for schools, hospitals, social and charity works
 Balance after deduction of administrative expenses will be distributed in prizes to ticket holders.
 The amount available for prizes must be certified by auditors the day preceding the draw. If it exceeds $75,000.00 it will be divided in as many units of $75,000.00 as the sum admits. If prize money available for distribution is under or over the $75,000.00 unit, then prizes will be distributed proportionately.
 PRIZES FOR EVERY $75,000.00 UNIT
WINNING HORSE $25,000.00
SECOND HORSE 10,000.00
THIRD HORSE 5,000.00
Drawers of other horses divide as follows:
Holders of Non-Running Horses each $250.00 15,000.00
Balance of $15,000 to be divided among holders
of Non-Winning Horses
50 CASH PRIZES DIVIDE 5,000.00
100 CASH PRIZES DIVIDE 5,000.00
500 CONSOLATION PRIZES DIVIDE 10,000.00
 ----------
TOTAL PER UNIT $75,000.00
 
 
 [2]
 The grounds asserted are as follows: A. The information contained in the affidavit to procure the warrant was stale; B. There was no basis in the affidavit upon which the alderman could find that the un-named informant was credible or his information reliable; C. The sum total of the facts communicated to the alderman, bothe oral and written, were insufficient in law for the alderman to find probable cause for the issuance of the search warrant; D. The alderman did not make an informed and deliberate determination as to probable cause; and E. The warrant was illegally executed in that the property not described in the warrant was seized merely as evidence
 
 
 [3]
 See 18 U.S.C.A. 1953(a)(b), set forth in footnote 5, post
 
 
 [4]
 'When constitutional rights turn on the resolution of a factual dispute we are duty bound to make an independent examination of the evidence in the record. See, e.g., Edwards v. South Carolina, 372 U.S. 229, 235, 83 S.Ct. 680, 9 L.Ed.2d 697; Blackburn v. State of Alabama, 361 U.S. 199, 205, n. 5, 80 S.Ct. 274, 4 L.Ed.2d 242.' Brookhart v. Janis, 384 U.S. 1, 4, n. 4, 86 S.Ct. 1245, 1247, 16 L.Ed.2d 314 (1966)
 
 
 [5]
 Section 1953(a) provides: '(a) Whoever, except a common carrier in the usual course of its business, knowingly carries or sends in interstate or foreign commerce any record, paraphernalia, ticket, certificate, bills, slip, token, paper, writing, or other device used, or to be used, or adapted, devised, or designed for use in (a) bookmaking; or (b) wagering pools with respect to a sporting event; or (c) in a numbers policy, bolita, or similar game shall be fined not more than $10,000 or imprisoned for not more than five years or both.'
 
 
 [6]
 Parimutuel payoff totals offer a convenient reference. They give the player a a chance to indulge in another form of the numbers game. That is, he may play any one, two or three digits, one at a time. Playing numbers in this fashion is called 'playing the leads'. The first digit is obtained from the parimutuel payoff totals of the first three races, say at Aquenduct, which are completed around 2:30 p.m.; the second from the totals of the first five races, at about 3:30 p.m.; and the third from the totals of the first seven races, which are over between 4:30 and 5:00 p.m. The results, besides being tamperpfoof, usually appear in newspapers of wide circulation, thereby giving the player who has not gone to Aquenduct that day an opportunity to check the digits which have been used to obtain the winning numbers for that day
 
 
 [7]
 For a description of the manner in which the numbers game is played, see Forte v. United States, 65 App.D.C. 355, 83 F.2d 612, 105 A.L.R. 300 (1936); Commonwealth v. Banks, 98 Pa.Super. 432 (1930)
 
 
 [8]
 For a more detailed description of how bolita is played, see Pinder v. United States, 5 Cir., 330 F.2d 119, 121
 
 
 [9]
 Webster's Third New International Dictionary, Unabridged
 
 
 [10]
 As far back as 1930, it was judicially announced that 'The great weight of authority is that 'policy' playing is a lottery.' Commonwealth v. Banks, 98 Pa.Super. 432, 436 (1930)