THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* JAMES J. HINES, J. RICHARD DAVIS and Others, Defendants.

Supreme Court, Extraordinary Special and Trial Term, New York County, July 7, 1938.

*Thomas E. Dewey, District Attorney* [*Charles P. Grimes, Sol Gelb* and *Stanley Fuld, Assistant District Attorneys*, of counsel], for the plaintiff.

*Joseph Shalleck* [*I. Maurice Wormser* and *Lloyd Paul Stryker* of counsel], for the defendant James J. Hines.

*George Carmody*, for the defendant J. Richard Davis.

PECORA, J. The defendants were indicted on thirteen counts, the first of which alleges conspiracy to contrive a lottery and to commit some of the acts in connection with " policy " playing. The other counts allege the offense of contriving, proposing and drawing a lottery on various occasions, at each one of which a crime of that nature is alleged to have been committed, and each constituting a separate count in the indictment. The demurrers are by defendants Davis and Hines, on the principal ground that the facts stated do not constitute a crime. The other grounds need not detain us.

The main basis of objection on the part of Davis is the contention that the crime of " policy " playing is specifically covered by statutes separate and apart from the anti-lottery laws. Even if the connivance in the management of a " numbers game " is to be deemed a lottery, it is urged that the specific treatment of it by the other statutes takes it out of the penal laws covering lottery in general. The other ground of demurrer is that the " numbers game " is not a lottery, and therefore counts two to thirteen, inclusive, do not allege the crime of contriving a lottery. A specific objection is also made by defendant Hines to the sufficiency of count one, which sounds in conspiracy, on the ground that no overt act is charged to him.

I shall first consider the demurrer to count one, which is the conspiracy charge. This is a misdemeanor, covered by section 580 of the Penal Law, which makes a conspiracy to commit a crime punishable as such. The crimes alleged to have been committed in connection with count one, are a conspiracy by the several defendants to violate section 1372 of the Penal Law against contriving a lottery,

and section 974, which deals with keeping up a place for the game of "policy," and other incidentals connected with "policy" playing. The sections of the Penal Law which the defendants are alleged to have conspired to violate are not mentioned by number, but their content is clearly identifiable by the language of the indictment used in count one. A conspiracy is thus alleged to commit both a misdemeanor (§ 974) and felonies (§ 1372). If policy playing is not a lottery, which is a matter I shall weigh subsequently in this opinion, then the conspiracy to commit the crime of a misdemeanor specified in section 974 would still remain and render the count good, provided the necessary overt acts were specified. Section 583 of the Penal Law provides that a mere conspiracy to commit a crime, except a felony upon the person of another, or arson, or burglary, is not punishable as a conspiracy, unless something is done to effect the object of the conspiracy. The things actually done in furtherance of the conspiracy are commonly known as overt acts.

A number of allegations are recited in the indictment under the heading "overt acts." The only ones affecting defendant Hines are two contained in paragraph 15. One is to the effect that in March, 1932, he met with others and conferred upon and discussed plans to influence, intimidate and bribe judicial officers. The other is that at the same time he received $1,000 in cash from Dutch Schultz, one of the conspirators. The first "overt act" is really a part of the conspiracy, looking toward action in the future, and is not properly an overt act. The receipt by Hines of a payment of $1,000 cash, although alleged as an overt act, is not such, but something done as a part of the agreement to cement the conspiracy. It is not inconsistent with a *locus pœnitentiæ* or an abandonment of the conspiracy by Hines. Nevertheless, the law makes overt acts of fellow conspirators binding upon one who is a member of the conspiracy. Whether Hines was still a member of the conspiracy when the overt acts by his alleged fellow conspirators were committed, is a question of proof. The allegation of the formation of the conspiracy is sufficient for indictment purposes, even if the $1,000 payment tending to show that Hines became a member of the conspiracy had been omitted. While the indictment is bare of facts connecting Hines with the crime of conspiracy, except the alleged conference on plans to influence judges and the item of $1,000, both of which elements are not inconsistent with a complete defense as a result of proof of subsequent timely recantation or relinquishment of intention by him, it is sufficient for pleading purposes. No special consideration is required to establish the sufficiency of the conspiracy count as to defendant Davis.

The objection to counts two to thirteen, inclusive, requires a more extended analysis. The best approach to the relation between the lottery crimes and the policy crimes is to trace the historical development, respectively, of (a) the lottery statutes in the general sense of the term, and (b) of the specific " policy " statutes. The history of these enactments will tend to sustain or overrule the contention that the " policy " statutes, although dealing with games having an element of chance and lottery, were intended as an exception to the general lottery statutes to be treated by a specific scheme of penal legislation. It is a more satisfactory treatment than inference from fragmentary expressions of short memorandum opinions of the courts, based upon a record of evidence which is not in the public reports of the cases.

While an anti-lottery statute directed specifically against raffling first made its appearance in 1813 (1 R. L. pp. 222, 223), the lottery statute which is the source of the present section 1372 of the Penal Law, was derived from chapter 206 of the Laws of 1819. That section was incorporated in the Revised Statutes as section 27 of article fourth of title 8, chapter 20 of part 1 (1 R. S. 664), entitled " Of Raffling and Lotteries." That section, in part, reads as follows: " No person, unauthorised by special laws for that purpose, shall, within this state, open, set on foot, carry on, promote, or draw, publicly or privately, any lottery, game or device of chance of any nature or kind whatsoever, or by whatever name it may be called, for the purpose of exposing, setting to sale, or disposing of any houses, lands, tenements, or real estate, or any money, goods, or things in action."

The crime was characterized as a misdemeanor, with a fine on conviction equal to the amount of the whole sum or value for which the lottery, game or device was made. If the amount could not be ascertained, the fine was fixed at $2,500 or imprisonment not exceeding two years, or both. Several other provisions of that Act of 1819, such as section 26, which declares every lottery, game or device of chance in the nature of a public nuisance, are also of interest, because they are found reflected in the existing sections of the Penal Law, such as section 1371. Section 26 is also reflected in the present section 1370 which defines a lottery. The section prohibiting the lottery, unauthorized by special laws, was carried in the Revised Statutes in that form until after the adoption of the Penal Code in 1881, being expressly repealed only as the result of the repealing acts adopted by chapter 593 of the Laws of 1886. The lottery section, however, appeared in another form in the Penal Code, which form will be discussed later.

The reference to lotteries unauthorized by special laws has become obsolete, in view of the constitutional prohibition of 1846, which banned all lotteries by mandate of the fundamental law.

The Revised Statutes, which contain the provisions as to raffling and lotteries under article fourth, pages 664 to 668 (so numbered in the early editions), were preceded in article third, pages 661 to 664, by prohibitions against " betting and gaming." The violation of most of the provisions against betting and gaming carried merely civil penalties, except certain sections which contained penalties for cheating at games, and a penalty for winning or losing twenty-five dollars or upward, both of which were treated as misdemeanors. The offense involved in cheating at games in addition was deemed by the statute a conviction for an infamous crime.

The next enactment was chapter 504 of the Laws of 1851, which was entitled: " An Act More Effectually to Suppress Gambling." It contained, first a prohibition against keeping a room or building for gambling purposes, with a penalty for conviction of a fine of not less than $50 nor more than $500. That provision, in section 1 of the law, has survived in very similar language in section 973 of the Penal Law. It is of no particular interest at the moment. Section 2 is, however, more important because it marks the genesis of our policy statute. It reads as follows: " § 2. If any person, for gambling purposes, shall keep or exhibit any gambling table, establishment, device or apparatus, or if any person or persons shall be guilty of dealing ' faro ' or banking for others to deal ' faro,' or acting as ' look-out ' or game-keeper for the game of ' faro ' or any other banking game, where money or property is dependent on the result, or if any person shall sell or vend lottery policies, purporting to be governed by the drawing of any public or private lottery, or if any person shall endorse a book or any other document for the purpose of enabling others to sell or vend lottery policies, he shall be taken and held as a common gambler, and upon conviction thereof, shall be sentenced to not less than ten days hard labor in the penitentiary, or not more than two years hard labor in the state prison, and be fined in any sum not more than one thousand dollars." That section was amended by chapter 214 of the Laws of 1855 by amplification of the provision against vending lottery policies by including in the prohibition any writing, card, paper or document in the nature of a bet, wager, or insurance upon the drawing or drawn numbers of any public or private lottery. That section as thus amended is very similar to section 970 of the Penal Law. These provisions of the Laws of 1851, already referred to, were incorporated in article third of the Revised Statutes in the title " Betting and Gaming," and marked sections 22 and 23 of that

article. I make mention of these apparently unimportant details because, as I discuss the matter later in connection with *Wilkinson* v. *Gill* (74 N. Y. 63), decided in 1878, the fact that the predecessor of sections 970 and 974 was included under an article entitled " Betting and Gaming " and not under " Raffling and Lotteries," is not necessarily decisive of the question as to whether policy playing was to be excluded from the classification of " Lottery."

The policy statutes, so-called and the lottery statutes were both incorporated in the Penal Code adopted in 1881. The main policy statute became section 344, with very slight changes. Subdivision 1 of the Laws of 1851 became section 343. The main lottery statute, however, had very marked changes in language. Section 27 of article fourth of the Revised Statutes became section 325 of the Penal Code, but in superficially very different language. Section 325 of the Penal Code read: " A person who contrives, proposes or draws a lottery, or assists in contriving, proposing or drawing the same, is punishable by imprisonment for not more than two years, or by a fine of not more than one thousand dollars or both."

This is the precise language of section 1372 of the Penal Law, which is involved in counts 2 and 13 of the indictment. The verbiage " contrives, proposes or draws " is so quaint, however, as to excite interest into its origin. In the time at my command I have found the immediate source of that language in the proposed Penal Code adopted by the Commissioners of the Code pursuant to chapter 266 of the Laws of 1857. That proposed code, published in 1864, contains the language in its proposed section 372: " Every person who contrives, prepares, sets up, proposes or draws any lottery, is punishable by a fine equal to double the amount of the whole sum of value for which such lottery was made; and if such amount cannot be ascertained, then by imprisonment in a state prison not exceeding two years, or by imprisonment in the county jail not exceeding one year, or by a fine of $2,500, or by both such fine and imprisonment."

The proposed Penal Code of 1864 does not seem to have been adopted by the Legislature. Instead, a revised form of it was adopted by chapter 676 of the Laws of 1881 and published in accordance with the direction in chapter 680 of the laws of that year. That Code contained the lottery statute as section 325 in the form which I have quoted, using the words " contrives, proposes or draws," and deriving its source in the language employed, undoubtedly, from the proposed Penal Code of 1864 just mentioned. The Penal Code of 1881 also, for the first time, contains in section 323 a statutory definition of a lottery instead of leaving it to implication. That definition is in language identical with that of section 1370 of the Penal Law.

I have not been able to find any prior source of the verbiage " contrive and propose " as contained in the proposed Penal Code of 1864 and embodied in the present statute. There are no definitions of the word " contrive " in any of the law dictionaries or any of the legal decisions. There is a definition in the Standard Dictionary which seems to fit the situation, in the following: " To manage or carry through by some device or scheme." The word " propose " in that context is more difficult to explain. I believe, by comparison with the old section in the Revised Statutes, that it is the equivalent of the phrase " set on foot " and " promote." In any event, the source of the verbiage implies a description of the crime of devising a lottery and carrying it into effect. It embraces the work of the master minds who make up the scheme and who " set it on foot " and supervise its execution. To use an analogy from the language of sport, the captains, the managers and the financial backers or promoters of the scheme are the persons intended to be covered by the definition, not the players on the team, the persons on the side lines, or the spectators.

With this preliminary exposition of the history of section 1372, we will now consider the main argument upon the demurrer, namely, that " policy " playing was not intended to be governed by that section. The chief ground for the argument is the adoption of the amendments, chapter 190 of the Laws of 1901 to section 344 of the Penal Code, which amendments now constitute sections 974, 975 and 976 of the Penal Law. The contention is that the Legislature that year intended to adopt an exclusive plan for dealing with " policy " playing, independent of any lottery statute, and that such exclusive plan must control in fixing penalties.

The records of the period, so far as I have been able to ascertain, do not support this contention. In giving my reasons for this conclusion I shall also consider the interwoven argument that the courts have declared the " numbers game " or " policy " to be separate and distinct from lottery; that consequently, counts two to thirteen of the indictment must fall, because they allege the contriving of the " numbers game " or " policy," to constitute violations of section 1372 (which makes the crime a felony), instead of violations of section 974 (which makes the offense a misdemeanor.)

In the Annual Reports of the Society for the Suppression of Vice (1902), at page 12, there is a statement of its activities in 1901 in connection with the amendment of section 344 of the Penal Code, which throws considerable light upon the origin of sections 344-a, 344-b and 344-c of that Code, now sections 974, 975 and 976 of the Penal Law. It conclusively strengthens the refutation of the argument that the amendments of 1901 created a new crime — that of main-

taining a " policy " game, as something no longer related to lottery. Section 344 in its provisions against common gamblers, and gambling or banking games, contained specific prohibitions against selling " what are commonly called ' lottery policies.' " That ban, as we have seen, was first embodied in chapter 504 of the Laws of 1851. It was probably due to the nefarious activities of " Al " Adams, the notorious policy king at the turn of this century, that an amendment of section 344 was sought so as to put teeth into the " policy " statutes. A full account of the activities of that offender is found in *People* v. *Adams* (85 App. Div. 390; affd., 176 N. Y. 351, and 192 U. S. 585).

In the society report mentioned, reference is made to seven raids on the " policy " headquarters of Adams, made under the direction of the secretary of the society, Anthony Comstock. The first raid occurred on July 11, 1882. Adams was thus violating the law against policy nearly twenty years before the adoption of the amended policy statutes of 1901. We also learn from the report that he was fined on two occasions, sentence suspended on another, and in the other instances he was not personally apprehended. The report also informs us of a conflict of opinion between Mr. Goddard, of the Society for the Prevention of Crime, and Mr. Comstock. The former proposed amendments of unusual severity, which probably would have been held to be unconstitutional. The more moderative views of Comstock prevailed. Instead of amending section 344 of the Penal Law three new sections were adopted, known as 344-a, 344-b and 344-c. We can more conveniently read them in their modern numbering in the Penal Law. Old section 344 is substantially 970 of the Penal Law, 344-a is 974, 344-b is 975, 344-c is 976. The amendments of 1901 were effected by chapter 190 of the Laws of 1901.

It is interesting to make certain comparisons between the amendments and the existing statutes in order to emphasize the fact that no material departure in the substantive criminal law of the State was made. Section 344 retained its penalties against lottery policies, together with other gaming or " banking " devices. Section 344-a went into greater particularization by specializing on the subject of " policy." What was new, however, was the content of section 344-b, now section 975, which made the possession of policy slips presumptive evidence of violation of section 344-a. It is this statutory rule of evidence which has given rise to much discussion as to the distinction between lottery slips and policy slips.

While " lottery " according to my interpretation of the term is broader than " policy," the possession of a lottery ticket is not the equivalent of the possession of a policy slip. As the court said in

*People* v. *Adams* (176 N. Y. 351, 359), the Legislature in passing section 344-a, merely amplified the statute intended to suppress gambling, by directing its specific attention to " policy," which offered an opportunity of making trifling bets to the poorer classes, who could ill afford to lose their earnings. The court in the *Adams* opinion thus continues its interpretation of sections 344-a and 344-b, by classifying policy slips in the same category as tools of a burglar or the general gambling apparatus which are dealt with in the penal statutes. Keeping those expressions in mind together with the statutory provisions, we must conclude that a lottery ticket is not in the class of burglars' tools, or gambling apparatus, while a " policy " slip is in that class. The possession of " policy " slips is presumptive evidence of violation of the law, and the burden of explaining away the possession is imposed upon the one who is found with them. The possession of lottery tickets carries no penalty and no burden, unless it is sold or otherwise used in connection with the violation of the general statutes against lotteries contained in article 130 of the Penal Law.

The foregoing distinctions must be kept in mind for a proper understanding of the ruling in *People* v. *Bloom* (248 N. Y. 582). In that case defendant was accused of unlawfully and knowingly possessing policy slips in violation of section 974 of the Penal Law. The Court of Appeals, in reversing the conviction, held that the certificates in possession of the defendant were not *policy* slips, although they evidenced that defendant was engaged in a lottery. The effect of this decision is that in order to secure a conviction under section 974 it is insufficient to prove that defendant is engaged in a lottery scheme. The case does *not* hold that " policy " is not a lottery, as defendants contend. Nor does it override, as defendants assert with much assurance, the doctrine stated in *Wilkinson* v. *Gill* (74 N. Y. 63) that " policy " is a lottery. The court there upheld the charge to the jury below that " playing policy " was the purchase of an interest in a lottery. What is said in that case about the effect of the amendment of 1851 is of interest. That amendment, which deals with policy playing, was, as we have seen, inserted in the Revised Statutes under " Article Third of Betting and Gaming " (5th ed., p. 926). The implied argument is that if it were intended to be a lottery it would have been put into article fourth, dealing with " Raffling and Lotteries." Another implied argument is that the special legislation upon the subject in 1851 put policy in the class of " betting " and not in the class of lotteries. The Court of Appeals brushed the distinctions aside, saying (at p. 67): " Every lottery has the characteristics of a wager or bet, although every wager is not a lottery. A lottery, game or device

in the nature of a lottery is not excluded from the operation of the statute because it also partakes of the nature of a wager. * * * It is claimed that the act of 1851 (chap. 504) is a legislative construction that ' policy ' is not a lottery. This act makes it a criminal offense for selling lottery policies, or any writing in the nature of ' bet, wager, or insurance upon the drawing or drawn numbers of any public or private lottery.' It may be that the defendant was liable under this statute, although in fact no policy or writing of any kind was issued or delivered, but I am at a loss to see upon what principle this act can be held to limit or restrict the meaning of the word lottery in the section under which this action was brought. The particular acts which the defendant may have done in pursuing the lottery business are perhaps described with more precision than in the section in controversy; but this cannot impair the meaning of the section as it stands. That section is general, but very comprehensive, and although the particular device adopted by the defendant may not then have been practiced, yet if its comprehensive terms embraced it, the subsequent passage of an act making such device criminal cannot affect its provisions."

Under the definition of " lottery " in section 1370 of the Penal Law, which in substance was the understanding of its meaning long before " policy playing " was known, a lottery is a scheme for the distribution of property by chance among persons who have paid a valuable consideration for the chance. Counts two to thirteen, inclusive, which accuse defendants of a violation of section 1372 of the Penal Law, for " contriving, proposing and drawing a lottery," contain the specifications that the scheme was based upon the selection of numbers by chance for the distribution of property among persons who had paid a valuable consideration for the chance. There is then added the specification that such lottery was known as " the numbers game " and " policy."

No doubt exists in my mind that the scheme of selection of numbers, by chance — by whatever name it might be called — for the distribution of property to those who paid for the chance of being selected is a lottery. As already observed, lotteries generally were made unlawful long before 1851 and before the probable existence of " policy playing." When, thereafter, a legal ban upon " policy playing " was created in 1851, it did not take policy out of the lottery statute. The only consequence was that alternate penalties for the offense came into existence. On this point the passage quoted above from *Wilkinson* v. *Gill* (*supra*) is clear. " Al " Adams could have been prosecuted either under section 1372 (then 323 of the Penal Code) or under section 974 (then 343-a of the Penal Code). The prosecutor chose section 343-a not because

the 1901 amendments constituted a separate scheme for dealing with "policy" offenders, which placed them outside of the lottery statute, but because the proof was easier under the special "policy" statute by reason of the presumptive evidence rule in section 343-b (now 975 of the Penal Law). Besides, both the lottery and policy statutes were then felonies.

The amendment of 1926 (chapter 435) made the "policy" and "common gambler" offenses of sections 970 and 974 of the Penal Law, misdemeanors, probably in order to bring them within the jurisdiction of the Courts of Special Sessions and thereby render prosecutions swifter and make convictions easier by making the penalties less drastic. In making this change as applied to the several offenses included in sections 970 and 974, it made no change in the penalty under section 1372, which applies to lotteries. But it did not effectuate any implied repeal of the lottery statute by taking "policy" out of its scope. It still remained the law that one who contrives, proposes or draws a lottery of the nature of "policy" or assists in contriving, proposing or drawing the same, is guilty of a felony. He must "manage" and "carry through" the scheme or assist in doing so.

Section 974 specifies a number of acts, for any one of which a violator would be guilty of a misdemeanor. Many of them involve elements of assistance in the operation of the schemes. But they are not necessarily of the type of assistance referred to in section 1372. Thus, one who lets premises for "policy" purposes is not necessarily assisting to "contrive, propose or draw." He is not a direct agent in the lottery machinery. An illustration of "assist" in such cases is found in *People* v. *Runge* (3 N. Y. Cr. Rep. 85). There the defendants sold a compartment box together with 150 pieces of chewing gum, each piece being numbered and sold to children for a penny. It drew a prize from the compartment corresponding to the number on the package. The defendants manufactured and arranged the box with numbers, and bought the gum, the design being to sell the entire apparatus containing the prizes together with the chewing gum to others, for retail sale of the chances. The court was doubtful whether defendants were contrivers, but it held they at least assisted in contriving. The person who assists in contriving, proposing or drawing the lottery must be an essential element in the scheme. This interpretation would seem to exclude the various accessory acts enumerated in section 974 as in the nature of assistance to the main plan, so as to justify an indictment of such accessories under section 1372. Nor would it necessarily authorize the indictment under that section

for the mere accessory acts mentioned in sections 1373 to 1382 of the lottery statutes.

It does not seem to me an adequate procedure to rule upon the validity of an indictment on the basis of the mere use of the expressions " numbers game " or " policy " as an example of a type of lottery and without evidence to show what these expressions mean. There is no doubt that, apart from the employment of these expressions, counts 2 to 13, being virtually in the language of the statute, are sufficient. Defendants' objection to their sufficiency is based upon the alleged declaration by the higher courts that " policy " is not a lottery. There is no unequivocal declaration to that effect in any of the cases. The most that can be said about the one that is most favorable to defendants (*People* v. *Weber*, 245 App. Div. 827) is that the court found from the evidence in the case that defendants, who were indicted under section 1372, were not guilty of contriving, etc., a lottery, although they were guilty of one or more of the acts enumerated in section 974, which is the statute covering policy. This is a far cry from an interpretation of the *Weber* case as holding that " policy " is not a lottery. The case in its result only lends emphasis to the observations of the court in *People* v. *Lyttle* (225 App. Div. 299) which thus comments upon the effect of the disposition in *People* v. *Bloom* (*supra*): " The decision in the case cited should lead in the future to a more careful consideration of the information to be filed under each set of circumstances, and due regard should be given to sections 974, 986 and 1374–1387 of the Penal Law." In other words, a person cannot be convicted of violating one statute when the facts show that he was guilty of the violation of another; even though, if he had been indicted under that other, the facts would have sustained his conviction. Consequently, although " policy " is a species of lottery, a person who is shown to be guilty of one or more of the numerous accessory acts referred to in section 974 relating to policy is not necessarily guilty of the more fundamental crime of contriving, proposing and drawing a lottery. Moreover, it follows as a corollary that one indicted under section 974 cannot be convicted upon proof of having violated section 1372, even though the trial should establish that he was the master mind of the whole scheme and the one who carried it into execution.

The recent cases, therefore, upon which defendants rely as having created a distinction between lottery and " policy " apart from the fact that they contain no such categorical differentiation, are all dispositions after trial and upon proof. I cannot take judicial notice that the numbers game or " policy " is definitely the kind of game referred to in the unreported evidence of a case,

the details of which must be sought in bound volumes not generally accessible. I cannot even take judicial notice of what is " policy " or " lottery policy," although the words of the statute, section 974 of the Penal Law, use the expressions " what is commonly called a lottery policy " and " what is commonly called policy " and " the game commonly called policy." Those expressions do not require that I must take judicial notice of what the game means, in the utter absence of any evidence or exhibits. The expressions " commonly known as " or " commonly called " refer to the common knowledge of those connected with the commission or the prosecution of the offense, the common knowledge of its nature in the crime world and its fringe. This view is supported by the authority of *People* v. *Emerson* (6 N. Y. Cr. Rep. 157, 159), from which I quote the following: " The evidence of Anthony Comstock, as to what is commonly known as a ' lottery policy,' does not seem to have been improperly received. The prisoner was indicted under section 344 of the Penal Code for selling divers papers, ' instruments and writings commonly called " lottery policies." ' The statute contains no definition of the term ' lottery policies,' and, the papers themselves not being before the court, it was competent to show by one who had familiarized himself with such documents precisely what is known among those who use them as a ' lottery policy ' or ' policies.' There certainly was nothing before the court which would enable it to take judicial cognizance of the nature or description of a lottery policy. And I agree with the district attorney that it was as proper to show by one familiar with the facts the nature and description of a lottery policy, as to prove — which I understand to be an everyday occurrence under section 410 of the Penal Code — the nature and description of a ' weapon commonly known as a " slung shot," ' or under section 508 what is an instrument adapted or commonly used for the commission of burglary."

It is futile, therefore, in the instant case for one of the defendants to argue that in lottery the purchaser buys a ticket with a number already imprinted thereon, which entitles him to a reward if the number thereafter is drawn at the lottery. In the game of " policy," he claims, in contradistinction, that a slip is prepared by the player himself, who places thereon a number or other mark of his own choosing. There is nothing in the indictment to show any such distinction. Even if this were established it would be a distinction without a difference and it would not serve to take the game of " policy " out of the definition of a lottery.

Nor is that defendant quite consistent in endeavoring to show that lottery, within the meaning of section 1372, involves " a trial or

test of skill," as distinguished from the mere blind choice of numbers. As authority for this distinction he advances *People* v. *Lyttle* (251 N. Y. 347). His conclusion is obviously based upon a palpable misconstruction of the language of that case. His distinction is just as unconvincing as would be the argument of a protagonist of the game of " policy," who, vaunting about its claimed superiority over blind choice in sweepstake lotteries, should point to the element of " skill " in playing " policy." He might direct attention, as an example of such skill, to the effectiveness of selecting numbers upon the basis of dream interpretations, divinations and " hunches." But the argument would leave the intelligent listener skeptical.

In any event, the court should not be asked, in the absence of a statutory definition of " policy," to draw a distinction between lottery and " policy " without evidence of the nature of the " numbers game " defendants are accused of contriving, proposing or drawing.

As my conclusion is that the indictment on its face is legally sufficient, it is unnecessary to pass upon the proposition that a demurrer might lie to one or more of the counts of an indictment, so as to authorize their elimination without affecting the indictment as a whole. That point was urged on the theory that, while the first count might be sufficient, counts two to thirteen are not. The district attorney's position was that even if counts two to thirteen were insufficient they could not be stricken out if count one is adequate.

The argument that a demurrer to the indictment must be to the indictment as a whole, and not directed to any part of it, is based largely upon the authority of *People* v. *Rosenheimer* (209 N. Y. 115), and quoted with approval, notwithstanding its character as a dictum, in *People ex rel. Weeks* v. *Platt* (173 App. Div. 451). I would not treat of this phase of the argument at all if it were not for the fact that in the light of the amendment of 1936 to section 279 of the Criminal Code, allowing a number of counts to an indictment to be joined, the dictum that a demurrer could not be considered unless it lay to the whole of an indictment is an anachronism. The Legislature should promptly set the other provisions of the Code of Criminal Procedure in harmony with amended section 279, so as to establish beyond doubt that an insufficient count in an indictment may be stricken out notwithstanding the presence of other valid counts. I do not hesitate to say that if at the end of a trial I should find a count in an indictment as not established by the evidence I should dismiss such count. The same principle should apply in the consideration of the sufficiency on its face of a count in an indictment. If it is insufficient, a defendant should

not be compelled to go to the trouble and expense of preparing for trial on inadequate allegations.

The demurrers are overruled, and defendants Davis and Hines directed to appear and plead to the indictments on the 11th day of July, 1938, at eleven A. M., in room 442 of the New County Court House.

In addition to interposing a demurrer to the indictment, the defendant Hines has addressed motions to the court for the following relief:

1. For a change of venue to another county not less than 100 miles from the city of New York. This motion is based upon section 344 of the Code of Criminal Procedure.

2. For a trial separate from the codefendants. This motion is made under section 391 of the Code.

3. For a bill of particulars as to each of the thirteen counts of the indictment. This motion is founded upon section 295-g of the Code and also upon the inherent power of the court.

The court will hold the motion for the bill of particulars under advisement until after the rearraignment of the defendant on July eleventh next, to plead anew to the indictment. This course is being followed in view of the overruling of the demurrer by the separate decision of this court filed on this day and the direction therein to the defendant to appear on that date for such pleading. The motion for a change of venue is supported by the defendant's affidavit and by the affidavits of eleven citizens of this county, as well as by two scrap books containing many clippings of items from various newspapers published in this city concerning the defendant and this indictment.

It is averred that the newspaper items are of such character as to have aroused a widespread prejudice against the defendant, thereby making it difficult — if not impossible — for him to receive a fair and impartial trial in this county. Were the evidence ample to sustain these averments it would be the duty of the court to grant a change of venue.

The evidence, however, falls substantially short of establishing these averments. Indeed, many of the newspaper articles present the defendant as an attractive personality, and might well be considered as exciting sympathy for him rather than prejudice. Some of them, it is true, might be regarded as unfair or prejudicial to him. Of a small number of these it could plausibly be contended that they exceed the bounds of good taste, or even that they violate the ethics of sound journalism with respect to the reporting of judicial proceedings.

But the evidence presented is inadequate even to support a suggestion that a jury of fair and impartial persons cannot readily be impaneled in this county to try the defendant.

Any resident of this county must recognize the fact that it has a most cosmopolitan population, eminently fair and tolerant in its sentiments. That its people are capable of using discrimination in the formation and exercise of their individual judgment has often been demonstrated at the polls where they have voted in large majorities against predominating newspaper opinion and exhortation.

The eleven affidavits above referred to are far from persuasive. They are phrased in identical words. In fact, most of them are carbon copies of two or three typewritten ribbon impressions. It would be quite extraordinary to find eleven persons in widely scattered circles of this community who had exactly the same reactions in a given situation. The form and content of these eleven affidavits savor too much of a " signing upon the dotted line " by the respective affiants to entitle them to serious weight.

The motion for a change of venue is denied. The motion for a separate trial has presented a more difficult question, although, like the preceding motion, it is addressed to the court's discretion. After extensive consideration of the arguments on both sides, I reach the conclusion that it, too, should be denied.

There are nine defendants named in the indictment. Four of them have not yet been apprehended. Of the remaining five, two have pleaded guilty, and it has been indicated that these two will testify upon the trial for the State. This leaves only three — inclusive of the moving defendant — to be tried. Neither one of the other two has ever been convicted of a crime. Both of them are lawyers, although one of them, Davis, has been disbarred in the past year upon charges of unprofessional conduct in connection with legal services rendered by him to persons charged with operating a so-called " policy racket."

Were the moving defendant to be surrounded upon the trial by a larger group of codefendants having criminal records or unsavory reputations, the court would be disposed to make a different disposition of this motion. The court earnestly feels, under the circumstances, that the rights of the moving defendant upon his trial jointly with the two defendants last discussed, can and will be scrupulously safeguarded.

Generally similar considerations recently prompted this court to deny a similar motion made by the defendant Weintraub.

The motions for a change of venue and for a separate trial are denied.