Edward Thompson,
Acting County Judge. Upon the conclusion of a trial without a jury (1ST. Y. Const., art. I, § 2) the defendants have moved for dismissal of an indictment, the first count of which charges them with having acted in concert in the contrivance, proposal and drawing of a lottery — and in assisting therein (Penal Law, § 1372) — and the second count of which accuses them of mutual engagement in a conspiracy to contrive, draw and assist in a lottery. The motions to dismiss proceed on the ground that the evidence is insufficient to make out a prima facie case of defendants’ guilt of either of the crimes charged, under the applicable provisions of law. The motions are denied and defendants are found guilty of the crimes, as charged, in both counts. The principal issue of law is whether the evidence makes out defendants’ guilt — beyond reasonable doubt — of the crime charged in the first count or whether, on the other hand, the case made out by the prosecution only establishes their guilt of an inferior crime (Penal Law, § 974) if, indeed, it establishes that. In determining that issue it is appropriate to review the facts as I find them from the evidence adduced.
From the evidence in the case, including their own admissions (binding, of course, only on their respective makers) I find that the defendants, on and between the dates alleged in the indictment were — and had been — engaged as principals, in carrying on the workings of a policy bank operating on credit. The circumstances leading up to and attending their apprehension were as follows.
On August 7, 8, and 11,1958 agents of the Police Department, in the course of an investigation, placed a number of wagers with policy collectors in Harlem. During the continuance of that investigation, defendant Martucci, on August 9, 1958, was seen to receive a green shopping bag from an unknown woman on an elevated railway station in Astoria, Queens County. Two days later Martucci — carrying a green shopping bag — and defendant Oaf aro — carrying a brown shopping bag — entered the basement of a private dwelling house at Jackson Heights, Queens County. All of the defendants had been seen emerging from these premises on August 9th and entering them on the 11th. They were its sole occupants when the police raided the place on August 11th.
*881 Upon their entry on that occasion the officers found defendant Coppo standing next to a chaise longue upon which were a number of envelopes and papers. These envelopes and papers contained the play ’ ’ of August 7, 1958 and consisted of 29 envelopes enclosing 458 policy slips on which were recorded policy wagers in excess of $8,000.
The defendant Cafaro was sitting at a table on which there were papers, envelopes, rubber stamps, pencils and other paraphernalia. The papers consisted of loose claim slips and betting slips, and 13 envelopes containing 41 policy slips on which were recorded wagers of approximately $500 for August 11 and weekly wagers in excess of $400. Still another envelope found on the table enclosed 19 slips of paper (claim slips) containing notations that certain players had been unpaid and that the defendants had overlooked these people when checking and determining the winners of the previous day.
The defendant Martucci was standing near the table holding in his hand certain bundles of envelopes and papers. These envelopes contained 500 policy slips on which were listed wagers totaling in excess of $900.
Surrounding the table and against the wall were a number of brown shopping bags containing the ‘ ‘ play ’ ’ and ‘ ‘ work ’ ’ of previous days, together with carbon copies of controllers’ tally sheets, headed by the initial or designation of the individual controller and the winning number for the day. These tally sheets listed the total collections made by the various collectors working for each controller connected with the policy bank, the records of amounts won by bettors of the several collectors working under such controllers and the amount of the controller’s and collector’s commissions, to wit 35%. The sum total of the “ play ” of all collectors and their agents working under the controller was set forth as the minuend and subtracted therefrom was the 35% due and owing as commissions to the controllers and collectors. Unpaid claims from previous day’s winners — overlooked by the bank when the previous day’s computations had been decided — were indicated as approved or disapproved. If approved, they were thence deducted from the previous remainder. The final remainder indicated the daily stricken balance after all adjustments, as previously set forth, had been made. It denoted the sum that the designated controller owed the bank at the close of each day’s business. This figure was carried forth to the following-day and at times reduced by a substantial amount in the thousands of dollars, from which fact an inference may be *882 reasonably drawn that such amount of money had been deposited with the bank by the controller overnight.
An examination of the respective shopping bags and their contents as well as the contents of the envelopes and the material found on the table, all of which were received in evidence against the three defendants, disclosed that the indicia of wagers approximated $70,000 per week or more than $3,000,000 annually.
When questioned after his arrest, the defendant Coppo stated that he, Martucci and Cafaro opened the envelopes as they came in, totaled the slips and entered the amounts on the respective tally sheets for each controller. This was done before the winning number came out (the winning number being calculated from prices paid on the results of certain horse races). Thereafter they rechecked the slips for winning numbers and if any were found the slips bearing them were put in a separate envelope and the remainder of the slips were gathered together. The daily wagers were retained for about a week, with the tally sheets for each day, since it sometimes took four or five days for a claim to come through. He further stated that the original of the tally sheets was sent to the respective controllers after they had been made out. The various claim slips were examined against the “play” or “ work ” for the day involved and Coppo and his codefendants determined the validity of such claims. Since the day was a warm one, the defendant Coppo was in a state of partial undress, wearing neither shirt nor trousers at the time of his arrest.
Defendant Cafaro stated that the premises were his father’s home; that he was there a few hours to work on the numbers; that his job was to meet a man nearby and bring a bag containing numbers to the premises; that he had the sole key to the premises and that he, Martucci and Coppo opened up the respective envelopes, checked the amounts played, inserted the slips in new envelopes with designations of the various collectors thereon made by them at that time, and after the slips were rechecked for winning numbers, the winning numbers were encircled. He said that he had been doing this for a few days. When asked to identify a certain paper, People’s Exhibit “ 8C ” Cafaro indicated that he knew it was a list of the controllers and balances owed by them, but stated that it was not his.
Martucci, when questioned, contended he checked the numbers and added them up and that he had obtained the job from a friend in a bar to make a few dollars.
*883 In sum, the evidence establishes that, beyond reasonable doubt, and, pursuant to a conspiratorial agreement between them, the defendants arranged the delivery of policy wagers to the premises, they checked the wagers for winning numbers, they totaled the amounts “played” on the various betting -slips, they transposed the total amount “played” to a controller’s tally sheet, they marked out the respective slips for winners and indicated them on the tally sheets, they checked the claim slips sent in by players for previous day’s “ play” or “ work ” and gave validity or invalidity thereto on the taHy sheet, they gave direction and instruction to the controller on said tally sheets to authorize payment of a claim by the collector, they wrote the tally sheets, they kept a running account of the controller’s activity striking a daily balance, against such daily balance they deducted commissions for the controllers and collectors and any claims deemed valid, they worked on “ all the stuff in the premises ” and they retained previous day’s “play” or “work” for whatever time they deemed necessary. Thus, as previously observed, they carried on the workings of a policy bank operating on credit.
From colonial days lottery has been prohibited or regulated by statute and section 1371 of the Penal Law decrees that a lottery is both unlawful and a public nuisance. One who contrives, proposes or draws, or assists in contriving, proposing or drawing a lottery commits a felony. (Penal Law, § 1372.) Other specific acts concerning lottery are declared to be misdemeanors. (Penal Law, § 1373 et seq.)
There are many kinds of lottery and the “ numbers game ”, “ policy ” or “ mutual race horse policy ” is one form thereof. (People v. Miller, 271 N. Y. 44 [1936].) By expert testimony it has been established that it is a game of chance in which the player selects a number containing three digits, bets his money on that number or a combination thereof and writes the same on a policy slip which is given, together with the money, to a so-called collector. The collector thereafter delivers it to the controller under whom various collectors operate. The controller thereupon delivers the slips (without the money) to the bank, administered by the three defendants in this case. The winning number is determined each day by chance, that is by a computation based upon the prices paid on the results of horse races at a designated race track. If a player succeeds in selecting a winning number he is paid odds varying from 600 to 1 or less, depending upon the odds set by the bank. The bank predetermines the trgek, the results at which determine *884 the winning number. Almost every jurisdiction has deemed this activity to be a lottery. (See Wilkinson v. Gill, 74 N. Y. 63 [1878]; Forte v. United States, 83 F. 2d 612 [1936], and cases cited thereunder.
Specific regulations governing aspects of “ policy ” came into being when sections 970 and 974 of the Penal Law were adopted. They deal with a prohibition against selling policy, indorsing a document to enable others to sell policy, keeping an establishment for policy playing or sale, delivering or receiving money in playing policy, possessing slips or wagers, possessing articles used in carrying on policy and the use of premises by an owner, agent, janitor, etc. for the sale of policy. It is apparent, therefore that there is both a general statute and a specific statute under which the defendants may be prosecuted. Innumerable decisions hold that the State may proceed under the general statute even though a more specific one is available. (People v. Malavassi, 248 App. Div. 784 [2d Dept. 1936], affd. 273 N. Y. 460; People v. Bord, 243 N. Y. 595 [1926].)
The defendants rely on People v. Weber (245 App. Div. 827 [1935]) for the proposition that a prosecution under section 1372 of the Penal Law is excluded by the facts as found in the instant case. But the facts in the Weber case clearly indicated nothing more than testimony of police officers that the defendants had been seen in a room sorting and tabulating policy slips.
In People v. Mines (168 Misc. 453 [1938]) the learned Justice who overruled the demurrer was unable to find any prior source of the verbiage “ contrived and proposed ” as contained in the present statute. He found no definitions of the word “ contrived ’ ’ in any of the law dictionaries but the definition in the standard dictionary did indicate that the words “ contrived and proposed ” imply the act of devising a lottery and carrying it into effect. He held that these words embrace the work of the ‘ ‘ master minds ” who set it' on foot and supervise its execution and used the analogy from sport language of being equivalent to captains, managers, financial backers and promoters of the scheme, not the players on the team nor the persons on the sidelines nor the spectators.
The Court of Appeals by clear and decisive language amplified the meaning of the words “ contrive ”, “ propose ” and “ draw ” in the same case (284 N. Y. 93, 107 [1940]) by holding that they were synonymous with ‘ ‘ open, set on foot, carry on, promote [or] draw” as found in the earlier statutes. These ■statutes confirm the proposition that a distinction must be made between a case where “ the only connection of a person with a *885 lottery begins and ends with his performance of incidental acts ” as specified in particular sections of the law and “ a case where such person performs acts in deliberate co-operation with those conducting and managing the lottery enterprise itself” (p. 107; emphasis supplied).
As I have previously indicated, many jurisdictions have adopted laws prohibiting lottery. The States of Minnesota and Washington are two which have adopted statutes identical with section 1372. As a matter of fact, the State of Washington has adopted the entire article 130 of our Penal Law without substantial change. The court of last resort of that State has construed the expression “contrives, proposes or draws” in the case of State v. Wong Took (147 Wash. 190 [1928]) and its opinion is entitled to substantial weight, since the Court of Appeals of this State has not passed upon the law as related to facts similar to those in this case. In the Washington case the court held (pp. 192-193): “‘The words “contriving, proposing or drawing a lottery, or assisting in contriving, proposing or drawing a lottery ’ ’ as used in the law, are applicable to persons cooperating in the instituting and administering of the lottery whatever may be the peculiar relations they sustain to it or to each other in rendering such cooperation. They apply to one who controls the establishment and procures or permits a lottery to be operated therein, or to one who engages in the illegal use of the premises in assisting in any way the contriving, proposing or drawing of a lottery ’ ”.
From the activities of the three defendants, as hereinbefore set forth, it is impossible to see how they could have been more closely connected with the lottery enterprise. As participants in a “policy” bank they exercised complete dominion over the affairs of the game, determined its winners and maintained custody of its records and paraphernalia. Can it be reasonably contended that the preparation of tally sheets, controllers ’ accounts and adjudication of claims amount to a violation of sections 970 or 974 of the Penal Law? I think not! Bather such operations indicate without doubt that the defendants co-operated fully to institute and administer the lottery and conducted and set up the scheme therefor. Certainly, they assisted in contriving, proposing and drawing the lottery and as such are responsible as principals. (Penal Law, § 2.) The contention that they are mere fringe employees is completely refuted by the evidence.
Concerning the second count of conspiracy to contrive, propose or draw a lottery, I find that the 13 overt acts alleged in the indictment have been proven. The corrupt agreement *886 to contrive, propose and draw the “policy” lottery is completely established by the admissions of the defendants, the exhibits and the testimony of the undercover agents disclosing the modus operandi of the lottery enterprise from the placing of the bet to the authorization of payment for winning numbers. The defendants acted as the sole determinants, the last resorts in the entire matter. They instituted, administered and conducted the same. Sufficient therefrom is the criminal intent to conspire. (People v. Tavormina, 257 N. Y. 84 [1931].)
The defendants lastly contend that even conceding the proven facts, they will not support the indictment under section 1372 and thus move for its dismissal on the further ground that they are insufficient. I hold as a matter of law that they are sufficient. (People v. Nitzberg, 289 N. Y 523 [1943].) While this proposition has merit, if their interpretation be correct, I conclude that the People are entitled to any reasonable doubt a Trial Judge may have upon the law. This is well established even though our criminal procedure gives the defendant the benefit of every reasonable doubt on the facts. (People v. Reed, 276 N. Y. 5 [1937].)