Susan M. FORD (Nos. 83–1105 and 83–1108), Karolyn A. Koluder (Nos. 83–1106 and 83–1109), and Janet E. Blair (No. 85–1017), Appellants,

v.

UNITED STATES, Appellee.

Nos. 83–1105, 83–1108, 83–1106, 83–1109 and 85–1017.

District of Columbia Court of Appeals.

Reargued En Banc May 8, 1987.

Decided Nov. 5, 1987.

---

Howard M. Markman, Washington, D.C., appointed by the court, for appellant Koluder.

Jonathan L. Stern, with whom James Klein, Washington, D.C., was on brief, for the Public Defender Service, amicus curiae appointed by the court.

Helen M. Bollwerk, Asst. U.S. Atty., Washington, D.C., for appellee. Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Judith Hetherton, Edward C. McGuire, Mark H. Dubester, Blanche L. Bruce, Kenneth J. Melilli, Mary A. Incontro, Mary Lou Leary, and Robertson T. Park, Asst. U.S. Attys., Washington, D.C., were on briefs, for appellee.

Peter G. Kuh, Chevy Chase, Md., appointed by the court, was on brief, for appellant Ford.

James L. Kaler, Jr., Washington, D.C., appointed by the court, was on brief, for appellant Blair.

### ON REHEARING EN BANC

Before PRYOR, Chief Judge, MACK, NEWMAN, FERREN, BELSON, TERRY, ROGERS, and STEADMAN, Associate Judges, and NEBEKER, Associate Judge, Retired.*

TERRY, Associate Judge:

In each of these consolidated cases, the appellant was convicted of what is commonly known as soliciting for prostitution under D.C. Code § 22–2701 (1985 Supp.).[1] The principal issue in all five appeals is whether the evidence was sufficient to support the appellants' convictions. The *Ford* and *Koluder* cases were submitted without argument before a division of this court. While they were pending, the *Blair* case was argued before another division, which later issued an opinion, with one judge dissenting, affirming the conviction. *Blair v. United States*, 525 A.2d 170 (D.C.1987). On the day that opinion was issued, it was vacated by the court *sua sponte*, in an order which also directed that the *Ford* and *Koluder* cases and the *Blair* case be reheard together by the court en banc. *Ford v. United States*, 525 A.2d 170 (D.C.1987).

The facts in all of these cases are quite similar. On separate occasions police officers saw Susan Ford, Karolyn Koluder, and Janet Blair waving and calling out to adult male occupants of automobiles and male pedestrians in an area known for a high incidence of prostitution and prostitution-related activities. Each was arrested, tried, and convicted under D.C. Code § 22–2701. Appellants all seek reversal of their convictions on the ground that the government presented insufficient evidence to convict them. In addition, appellant Blair argues that the trial court erred in admitting the testimony of an expert at her trial. We hold that the evidence in each trial was insufficient because it did not include proof of a crucial element of the offense, *viz.*, that the appellant offered or agreed to engage in a sexual act "in return for a fee," as the statute requires. We also hold that the expert testimony was erroneously admitted in the *Blair* case.[2] We therefore reverse all the convictions and remand all five cases with directions to enter judgments of acquittal.

### I.  FORD AND KOLUDER

Susan Ford and Karolyn Koluder were jointly charged with soliciting for prostitution on two separate occasions. They were tried together twice in the Superior Court before Judge Sorrell, sitting without a jury.[3] Because their appeals challenge the sufficiency of the evidence against them in both cases, we shall summarize separately the evidence presented at each trial.

### A.  Trial No. 1

The government's evidence consisted entirely of the testimony of two police officers, Richard Skirchak and Gerard McSorley. Both men are career police officers with close to thirty years' experience between them. In addition, each has spent

---

\* Judge Nebeker was an Associate Judge of this court at the time of oral argument. His status changed to Associate Judge, Retired, on September 1, 1987.

**1.** "It should be noted at the outset that neither the word 'solicit' nor the word 'solicitation' is used in the statute." *Dinkins v. United States*, 374 A.2d 292, 295 (D.C.1977) (en banc).

**2.** Each appellant also raises several constitutional issues, which we do not consider, given our reversal of all the convictions on evidentiary grounds. *See Dandridge v. Williams*, 397 U.S.

471, 475–476, 90 S.Ct. 1153, 1156–57, 25 L.Ed.2d 491 (1970); *Neese v. Southern Ry.*, 350 U.S. 77, 78, 76 S.Ct. 131, 132, 100 L.Ed. 60 (1955); *Alma Motor Co. v. Timken–Detroit Axle Co.*, 329 U.S. 129, 136–137, 67 S.Ct. 231, 233–34, 91 L.Ed. 128 (1946); *Spector Motor Service, Inc. v. McLaughlin*, 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944).

**3.** Because a violation of D.C.Code § 22–2701 is punishable by a maximum of ninety days' imprisonment or a $300 fine, or both, it is not a jury-triable offense. *See* D.C.Code § 16–705(b) (1981).

several years with the Prostitution and Obscenity Branch of the Morals Division.

The officers testified that on April 19, 1983, beginning at approximately 8:45 p.m., they were working under cover in the vicinity of 14th and L Streets, Northwest, an area notorious for solicitation of prostitution and related activities. Sitting in an unmarked parked car, they watched the activities of Ford and Koluder, who were standing on the southwest corner of the intersection.

The officers described seven incidents which they believed justified arresting the two women for solicitation. The first three incidents were virtually identical: in each instance, the two appellants simultaneously approached a male pedestrian and engaged him in brief conversation, after which the pedestrian walked away. On the other four occasions the officers saw one or both appellants wave at passing motorists and engage in brief conversations with the occupants of each car that stopped; each time, however, the car drove away unaccompanied by either appellant. The officers observed that neither appellant approached any women, families, or couples, nor did they at any time approach a bus or taxicab or hand out literature or other objects for distribution or sale. After watching appellants' activities for about fifty minutes, Skirchak and McSorley placed them both under arrest.

On cross-examination both officers admitted that they did not hear the conversations between appellants and the several men who stopped briefly to talk with them. In particular, Officer Skirchak said that he heard none of the conversations, and agreed with counsel that appellants "could have been talking about the weather" as far as he knew. Sergeant McSorley also acknowledged that he did not hear any of the conversations between either appellant and any of the persons to whom she waved or beckoned.

Neither appellant presented any evidence. The trial court, although expressing reservations about the case, found both appellants guilty on the basis of the police officers' testimony.

### B. *Trial No. 2*

As in the first trial, the government's evidence consisted solely of the testimony of two police officers, in this instance Wayne Mullis and Geary Scott. Both officers had extensive police experience, twenty-four years between them, but neither had been with the Morals Division for more than a year or so.

The officers testified that on July 21, 1983, at approximately 12:20 a.m., they saw both appellants standing on the corner of 14th and L Streets, Northwest. These officers also noted that this was an area known for solicitation of prostitution.

Mullis and Scott watched the two appellants for about an hour. During that time they waved at, stopped, and talked with several male motorists and pedestrians; a few times one or both appellants yelled "Hey, honey" or "Hey, fellows" to the passing motorists.

On one occasion appellant Koluder waved to a male pedestrian who was standing across the street. She motioned for him to cross the street, and he came toward her. Then, after a brief conversation, the two of them walked over to a blue van and drove away. Officer Scott followed the van to Alexandria, Virginia, where Koluder and her companion parked the van and entered a town house. Scott sat in his car outside the town house for the next fifty minutes. Eventually the man opened the door of the town house and leaned out; as he did so, Scott could see that he was not fully dressed. Koluder then came out of the house, walked down the street, and hailed a cab. Officer Scott followed the cab back into the District of Columbia, and at Thomas Circle—one block from 14th and L Streets—he pulled it over and arrested Koluder. On cross-examination, Scott admitted that he had no knowledge of the relationship between Koluder and her male companion, nor did he know whether the two knew each other before that evening.

Meanwhile, Officer Mullis continued to watch appellant Ford as she approached male pedestrians a few more times and engaged in brief conversations with them.

Ford also waved to two passing motorists. Mullis then placed her under arrest.

On cross-examination, Officer Mullis testified that before the 1981 amendment to D.C. Code § 22–2701,[4] he had never arrested anyone for sexual solicitation unless he or a backup officer had been personally solicited. In this case, however, except for overhearing the word "honey," Mullis admitted having no knowledge of the contents of any of the conversations that either appellant had with the men she encountered on the street. Significantly, Mullis "didn't believe it was necessary" to speak to either appellant because he had "already formed an opinion as to what they were doing." That opinion was based upon his "knowledge of the two defendants and their previous arrests, and their actions that night."

Officer Scott also admitted that before the enactment of the "beckoning amendment" to section 22–2701, he had never made an arrest for solicitation for prostitution unless it "involved actual solicitation" or he had overheard a solicitation. Like Officer Mullis, Scott testified that he had no knowledge of any of the conversations between appellants and the various men with whom they spoke that night. When defense counsel asked, "Were it not for the beckoning statute, you would not have arrested them that night, would you?", Officer Scott replied, "No."

As in the first trial, neither appellant presented any evidence. The trial court found them both guilty, although it noted that it "would not find the evidence sufficient to convict the defendants absent the recent amendments to the statute."

## II. BLAIR

Appellant Blair was tried before Judge Smith, sitting without a jury. The government's evidence consisted of the testimony of two members of the Metropolitan Police: Officer Glen Heilizer, a two-year member of the force, and Detective Wally Papaj, who testified as an expert witness.

Officer Heilizer testified that on the evening of May 28, 1985, from a hidden observation post, he watched appellant Blair for almost an hour as she stood on the corner of 14th Street and Rhode Island Avenue, N.W., an area notorious for prostitution activity.[5] For most of this period Heilizer maintained his surveillance from a hidden observation post about sixty feet from Blair and twenty-five to thirty feet above the ground, from which he had an unobstructed view of her activities.[6] She was wearing a long-sleeved pink and white blouse, white slacks, and white tennis shoes.

As Heilizer watched, Blair waved to nineteen vehicles that drove past on the street —mostly cars and pickup trucks, as well as one van—all of which were occupied by adult males, usually alone (except for the van, in which there were several men). She also approached five or six groups of male pedestrians and engaged them in conversation. Officer Heilizer testified that Blair did not wave to three taxicabs that drove by. Whenever a vehicle stopped, Blair engaged in a brief conversation with the driver. Officer Heilizer jotted down a description of each vehicle, the conversation (if any) that he overheard, and whether each car slowed down, stopped, or passed without stopping. Twice Blair left the area with male motorists, once for eleven minutes and once for four minutes, then returned to the same location. Heilizer said that while standing on the sidewalk Blair would rotate her hips back and forth in a provocative fashion, which he demonstrated to the court. He also stated that she uttered various phrases to passing motorists such as "Come here," "Hey, babe," "Yoo hoo," "Hey, honey," "Come back," and "Don't leave." After watching Blair for almost an hour, Officer Heilizer left his observation post and placed her under arrest.

---

4. See pages 622–623, *infra*.

5. This is approximately three blocks north of 14th and L Streets, the locale of Ford and Koluder's activities.

6. From time to time Blair walked away from Officer Heilizer's field of vision, but never for more than ten minutes or so.

Detective Wally Papaj, a fifteen-year veteran of the Morals Division, was accepted by the court (over defense objection) as an expert "in the area of prostitution and solicitation." After describing his background and experience, Detective Papaj was asked the significance of conduct like that in which Blair had engaged—"standing, waving at cars, and using words like 'hey, babe' and 'hey, honey' as the cars came up...." He replied that such activity "would be prostitution-related."

Q. [by the prosecutor]: And what do you mean by that?

A. That they are trying to get a date, trying to get the guy to pull over so they can have a talk with them and see if they want a date.

Q. And what do you mean by a "date"?

A. Have sex for money.

The defense evidence consisted of Blair's testimony that she was not soliciting for the purpose of prostitution, but was trying to hitch a ride home to Hyattsville, Maryland, because she had no money for bus fare. She testified that she worked as a baby-sitter for her sister during the daytime and evenings, but on that particular day she had been visiting friends in town. Blair acknowledged that near where she stood were two other women who were working prostitutes. She knew many people from that area because she had lived in the District of Columbia for thirteen years and "had been a prostitute in the area for years." She said she knew the drivers of several of the cars she flagged down, but only by their first names, some of which she tried to recall. She specifically denied saying "Hey, honey," "Yoo hoo" or "Come back, come back," and also denied swinging her hips back and forth.

The court credited the testimony of Officer Heilizer, noting that Blair's own testimony was "almost identical." After considering all the evidence, the court said it was "very simple to find" that Blair was guilty of soliciting for prostitution.

## III. THE STATUTE

Before 1981 section 22–2701 of the code provided:

It shall not be lawful for any person to invite, entice, persuade, or to address for the purpose of inviting, enticing, or persuading, any person or persons sixteen years of age or over in the District of Columbia, for the purpose of prostitution, or any other immoral or lewd purpose, under a penalty of not more than $250 or imprisonment for not more than ninety days, or both.

D.C. Code § 22–2701 (1973). The District of Columbia Council amended the statute in 1981 by raising the maximum fine from $250 to $300 and adding a second sentence, as follows:

Inviting, enticing, or persuading, or addressing for the purpose of inviting, enticing, or persuading for the purpose of prostitution includes, but is not limited to, remaining or wandering about a public place and: (1) Repeatedly beckoning to, repeatedly stopping, repeatedly attempting to stop, or repeatedly attempting to engage passers-by in conversation; (2) stopping or attempting to stop motor vehicles; or (3) repeatedly interfering with the free passage of other persons; for the purposes of prostitution.

D.C. Law 4–57, § 3, 28 D.C. Reg. 4652 (1981), codified at D.C. Code § 22–2701 (1985 Supp.).[7] At the same time, the Council added a new "definitions" section to the code which included the following:

"Prostitution" means the engaging, agreeing to engage, or offering to engage in sexual acts or contacts with another person *in return for a fee.*

*Id.* § 2(1), codified at D.C. Code § 22–2701.1 (1) (1987 Supp.) (emphasis added).

The 1981 amendment did not change the elements of the offense proscribed by section 22–2701, nor did it increase or decrease the government's burden of proof. The

---

7. A 1985 amendment, which has no bearing on this case, deleted the words "sixteen years of age or over" from the first sentence of the statute.

D.C.Law 6–62, § 2, 32 D.C.Reg. 4581 (1985); *see* D.C.Code § 22–2701 (1987 Supp.).

legislative history makes plain that the Council's purpose was simply "to clarify that the prohibition against soliciting acts of prostitution includes, but is not limited to, the specific enumerated conduct when engaged in for the purpose of prostitution." Council of the District of Columbia, Report of the Committee on the Judiciary, Bill No. 4–184, at 1 (July 22, 1981) (hereinafter "Committee Report").

Unfortunately, the Metropolitan Police read the amendment differently. On August 12, 1982, the Chief of Police issued Special Order No. 82–29 to the members of his department, setting forth the department's policy and interpretation of the new statutory language. The Special Order stated:

> The ... amendment is designed to afford the Metropolitan Police Department an additional tool for dealing with prostitution-related crime and other undesirable activity, when members are *unable to observe, and prove, all elements of a completed act of solicitation in fact.* Thus, repeated acts which themselves do not individually show a complete act of solicitation may be grouped to prove solicitation in fact. [Emphasis added.]

Consistently with this Special Order, both officers in the second trial of Ford and Koluder testified that before the 1981 amendment they would not have made arrests for solicitation unless they themselves had been solicited or unless they or some other officer had actually heard words of solicitation.

The police department's interpretation of the 1981 amendment is unacceptable because it is based on the unconstitutional[8] premise that all the elements of the offense need not be proven. The legislative history makes clear that the Council did not intend to give the police the additional powers claimed in the Special Order:

> There is no intention on the part of the drafters to give any additional discretion to law enforcement by delineating specif-

ic prohibited behavior. The provisions are still limited to conduct of a demonstrably harmful sort carried out for the purpose of committing a specific offense, namely prostitution.... The bill does not authorize the arrest of a person based on simple loitering. Rather, it requires the wandering *plus additional objective conduct evincing that the observed activity is for the purpose of prostitution....*

Committee Report, *supra* at 4 (emphasis added). In addition, the General Counsel to the Council stated in a memorandum that the proposed amendment was "merely redundant, or repetitive, of the existing law." Memorandum from Lawrence H. Mirel, General Counsel, to David A. Clarke, Chairman, Judiciary Committee, at 3 (April 8, 1981). To the extent that it "may be interpreted as going beyond existing law, it raises serious constitutional problems." *Id.* at 1.

> While I believe that the proposed bill is merely redundant of existing legislation, it is possible that its author anticipates that it would allow police to arrest persons simply for repeatedly beckoning or stopping motor vehicles or pedestrians in areas which are notorious for drug sales or prostitution. I do not believe it would give the police that power, and if it did it would probably be unconstitutional.
>
> The bill, in my view, would not give police the power to arrest simply for beckoning or stopping persons in notorious areas because the bill specifically says that such beckoning and stopping is illegal only if done "for the purpose of prostitution".... Thus the bill itself requires a finding of the underlying intent to commit a criminal act, just as existing law does.

*Id.* at 4.

There is nothing in the legislative history to suggest that the Council rejected the sound advice of its General Counsel or that it disagreed with the Committee Report. Moreover, in *Ford v. United States*, 498

---

8. "[W]e explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of *every fact necessary to constitute the crime* with which he [or she] is charged." *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed. 2d 368 (1970) (emphasis added).

A.2d 1135, 1140 (D.C.1985) (hereinafter "*Ford I*"), we held that the statute as amended was not unconstitutionally vague, but only because it "requires that conduct be for the purpose of prostitution and because it provides that objective criteria must be present in order to support a conviction." We conclude, therefore, that the amended statute requires proof by "objective criteria" that the defendant had a purpose to engage in "sexual acts or contacts with another person in return for a fee." [9] Anything less would not satisfy the requirements of due process. *In re Winship, supra* note 8.

### IV. THE EVIDENCE IN THESE CASES

■ The crime of soliciting for prostitution has four elements. To convict any defendant of that offense under D.C. Code § 22–2701, the government must prove that he or she

(1) invited, enticed, or persuaded (or addressed for the purpose of inviting, enticing, or persuading) (2) a person age 16 or over (3) for the purpose of engaging, agreeing to engage, or offering to engage in sexual acts or contacts with that person (4) in return for a fee.

*Graves v. United States*, 515 A.2d 1136, 1145 (D.C.1986). All three appellants contend that the evidence offered by the government was insufficient to sustain their convictions because there was no proof of the fourth element. We agree.

In considering a claim of evidentiary insufficiency, "we must review the evidence in the light most favorable to the government, recognizing the factfinder's role in weighing the evidence, determining the credibility of witnesses, and drawing justifiable inferences from the evidence." *Ford I, supra,* 498 A.2d at 1137; *accord, e.g., United States v. Hubbard*, 429 A.2d 1334, 1337–1338 (D.C.), *cert. denied,* 454 U.S. 857, 102 S.Ct. 308, 70 L.Ed.2d 153 (1981); *Byrd v. United States,* 388 A.2d 1225, 1229 (D.C.1978); *Crawford v. United States,* 126 U.S.App.D.C. 156, 375 F.2d 332 (1967); *Curley v. United States,* 81 U.S.App.D.C. 389, 160 F.2d 229, *cert. denied,* 331 U.S.

837, 67 S.Ct. 1512, 91 L.Ed. 1850 (1947). Moreover, there is no legal distinction between direct and circumstantial evidence. *Hall v. United States*, 454 A.2d 314, 317 (D.C.1982); *Byrd v. United States, supra,* 388 A.2d at 1229; *Chaconas v. United States,* 326 A.2d 792, 797 (D.C.1974).

The government's argument that there was sufficient evidence of solicitation for a fee is based on this court's decision in *Ford I, supra,* a factually similar case (coincidentally involving one of these appellants) in which the evidence was held to be sufficient. Appellants, on the other hand, urge us to follow *Graves v. United States, supra,* in which a division of this court reversed the convictions of both appellants because there was "no record evidence that appellants offered or attempted to engage in sex in return for a fee," so that "the evidence [was] insufficient to prove beyond a reasonable doubt that appellants' conduct was for a commercial purpose." 515 A.2d at 1146 (footnote omitted). We agree with appellants because, as we emphasized in *Graves,* the issue of whether there was sufficient evidence of a fee was not raised, and therefore was not decided, in *Ford I.*

■ Although sufficiency was an issue in *Ford I,* the entire focus of the appellant's argument was on whether the officer's testimony established a solicitation. There was no challenge whatever to the proof of the purpose of the solicitation, and the division did not raise the issue on its own. Such restraint by the division was, of course, entirely proper.

The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them.

*Carducci v. Regan,* 230 U.S.App.D.C. 80, 86, 714 F.2d 171, 177 (1983). Had the court in *Ford* (or any other case) reached out and decided an issue that was not raised by the parties, or at least briefed or argued after having been raised by the court *sua sponte,* the losing party would have had a

---

9. D.C.Code § 22–2701.1(1) (1987 Supp.).

legitimate complaint. Thus the *Graves* court was absolutely right in concluding that it was not bound by *Ford I* because *Ford I* "does not even discuss, let alone purport to decide, the fee issue." *Graves, supra,* 515 A.2d at 1147.

The court noted in *Graves* that it had "found no case in the District of Columbia, until [*Ford I*], which has upheld a conviction [of soliciting for prostitution] without some reference to financial consideration." *Id.* (citations omitted). The only logical explanation for this difference between *Ford I* and all the other reported cases, as the *Graves* court inferred (and as the record in *Ford I* confirmed), is that the issue of "financial consideration" was not raised in *Ford I.* As *Graves* and many other cases make clear, the statute requires in every case that there be proof of a commercial purpose in the transaction between the putative prostitute and her putative customer; without such proof, the statute almost certainly could not withstand constitutional challenge. *See Wood v. United States,* 498 A.2d 1140, 1144 (D.C. 1985); *United States v. Moses,* 339 A.2d 46, 51–53 (D.C.1975), *cert. denied,* 426 U.S. 920, 96 S.Ct. 2624, 49 L.Ed.2d 373 (1976). Although it does not matter which party "broaches the commercial nature of the transaction," there must be evidence of "an understanding ... that a commercial venture was contemplated when the sexual availability was made apparent." *Dinkins v. United States, supra* note 1, 374 A.2d at

296. There was no such evidence in these cases.[10]

▆▆▆ The government argues that the totality of the circumstances in these cases supports a finding that each appellant was soliciting for the purpose of prostitution. We cannot agree. None of the conversations overheard by the officers included any offer of sex in exchange for a fee or for any form of consideration.[11] The evidence presented in these cases established, at most, that appellants looked and perhaps acted like prostitutes, but that is not enough to sustain a conviction. *See City of Portland v. Miller,* 62 Ore.App. 145, 149, 659 P.2d 980, 983 (1983). The fact that each appellant was beckoning to male motorists and talking to male pedestrians was ambiguous without further proof that there was some reference to financial consideration.[12] "[I]nferential proof of an ultimate fact may not be based upon a mere possibility, speculation or conjecture." *Jackson v. District of Columbia,* 180 A.2d 885, 888 (D.C.1962) (footnote omitted). Because there was no evidence in any of these cases "that a commercial venture was contemplated when the sexual availability was made apparent," *Dinkins v. United States, supra* note 1, 374 A.2d at 296, all five convictions must be reversed.

## V. Expert Testimony

The issue of whether expert testimony was properly admitted arises only in the

---

**10.** Except for *Ford I,* this court has never upheld a conviction of soliciting for prostitution under section 22–2701 without some evidence of an offer to exchange sex for a fee. *See, e.g., Eissa v. United States,* 485 A.2d 610, 611 (D.C.1984), *cert. denied,* 474 U.S. 1013, 106 S.Ct. 544, 88 L.Ed.2d 474 (1985); *Washington v. United States,* 475 A.2d 1127, 1129 (D.C.1984); *Dinkins v. United States, supra* note 1, 374 A.2d at 294–295; *Garrett v. United States,* 339 A.2d 372, 373 (D.C.1975); *Wajer v. United States,* 222 A.2d 68 (D.C.1966); *Golden v. United States,* 167 A.2d 796, 797 (D.C.1961); *Price v. United States,* 135 A.2d 854, 855 (D.C.1957); *Curran v. United States,* 52 A.2d 121, 122 (D.C.1947); *Hall v. United States,* 34 A.2d 631, 632 (D.C.1943); *see also United States v. Smith,* 330 A.2d 759 (D.C. 1975).

**11.** The fee need not be offered or paid in money; anything of value will suffice. *Muse v. United States,* 522 A.2d 888 (D.C.1987).

**12.** In *Williams v. United States,* 71 App.D.C. 377, 110 F.2d 554 (1940), the United States Court of Appeals reversed a conviction of soliciting for prostitution on two grounds, one of which was that the evidence was insufficient. In so ruling, the court said:

> [T]here was no proof that defendant's purpose was among those which the statute prohibits. The government's evidence was that she approached a policeman's car on a certain street and "asked him if he wanted a date;" that he answered yes; that she asked if she should get in the car, and he answered yes; that she got in the car and asked "if he wanted to drive and talk." Defendant's purpose was at worst ambiguous. There was no evidence that the parties were strangers to each other; and even if they were, the proposed "date" did not necessarily include prostitution.

*Blair* case. Blair contends that the trial court abused its discretion in admitting, over objection, the expert testimony of Detective Papaj. She asserts that Papaj testified to matters which the court itself, as factfinder in a non-jury trial, was competent to decide, and that the prejudice resulting from the admission of his testimony outweighed its probative value.

Expert testimony is admissible when its subject matter is "so distinctively related to some science, profession, business or occupation as to be beyond the ken of [the average lay person]," and when the expert witness has "sufficient skill, knowledge, or experience in or related to the pertinent field or calling as to make it appear that his [or her] opinion or inference will probably aid the trier in the search for truth." E. CLEARY, MCCORMICK ON EVIDENCE § 13, at 33 (3d ed. 1984); *accord, Dyas v. United States,* 376 A.2d 827, 832 (D.C.), *cert. denied,* 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977). Additionally, the probative value of the expert testimony must outweigh its prejudicial impact. *Ibn–Tamas v. United States,* 407 A.2d 626, 632 (D.C.1979). The trial court, of course, "has broad discretion to admit or exclude expert testimony, and its decision either way will not be disturbed on appeal unless it is manifestly erroneous." *Hinnant v. United States,* 520 A.2d 292, 293 (D.C.1987) (citations omitted); *see Salem v. United States Lines Co.,* 370 U.S. 31, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962); *Ibn–Tamas v. United States, supra,* 407 A.2d at 632; *Dyas v. United States, supra,* 376 A.2d at 831–832.

It is generally acknowledged that experienced police officers can be helpful in explaining to ordinary citizens the *modus operandi* of persons who commit crimes, and on that basis they have frequently been allowed to testify as expert witnesses. *E.g., Hinnant v. United States, supra,* 520 A.2d at 293–294 (upholding admission of detective's testimony about "the use, sale, and packaging of heroin on the streets"); *United States v. Jackson,* 138 U.S. App.D.C. 143, 145–146, 425 F.2d 574, 576–577 (1970) (expert witness permitted to describe techniques of pickpockets); *Forte v. United States,* 65 App.D.C. 355, 83 F.2d 612 (1936) (expert testimony on gambling and lottery operations). Nevertheless, expert testimony should be admitted only when it is "of appreciable help" to the trier of fact in understanding the proven facts and drawing conclusions from them. *United States v. Jackson, supra,* 138 U.S.App.D.C. at 145, 425 F.2d at 576; *accord, Lampkins v. United States,* 401 A.2d 966, 969 (D.C. 1979) (expert may testify "only to the extent necessary to aid the trier of fact").

■ Significantly, Detective Papaj did not testify—nor could he, because he had not been there—that appellant Blair, on any of the occasions when she waved at cars and talked to the motorists who stopped at her signal, had offered to perform any sexual act in return for a fee. At most, Papaj's testimony showed that Blair's conduct on the evening of May 28 was consistent with the general behavior pattern of prostitutes. We may even assume that it was sufficient to prove that she was in fact a prostitute. But prostitution is not a crime in the District of Columbia. What the law brands as criminal is not the status of being a prostitute, but the act of offering to engage in some sort of sexual conduct with another person in return for a fee. *See, e.g., United States v. Moses, supra,* 339 A.2d at 50–51; *cf. Robinson v. California,* 370 U.S. 660, 666–667, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962) ("a statute which makes the 'status' of narcotic addiction a criminal offense" violates the constitutional ban on cruel and unusual punishment); *Ricks v. District of Columbia,* 134 U.S.App.D.C. 201, 214, 414 F.2d 1097, 1110 (1968) ("a citizen cannot be punished merely for being 'a suspicious person'" (footnote omitted)). Thus in every case in which a defendant is charged with soliciting for prostitution under D.C. Code § 22–2701, the government must prove not just the defendant's conduct, even though it may strongly suggest (as it did in this case to Detective Papaj) that she is a prostitute, but the substance of the exchange between the defendant and another person. The exchange need not be verbal (though it almost always is), and proof of particular language is not neces-

sary to establish the offense. However, there must at least be some evidence of a communication, verbal or nonverbal, between the defendant and the other person *and some proof that the contents of that communication is within the proscription of the statute.* E.g., *Dinkins v. United States, supra* note 1, 374 A.2d at 296. The illegality lies in the communication itself, not in the conduct leading up to it.

Detective Papaj's testimony shed no light on what Blair might or might not have said to the motorists who stopped their cars and talked with her. It was apparently offered to show that her purpose in waving at cars and talking to the occupants of those that stopped, all of whom were male, was to engage in sex for money. But it is not a crime, even for a prostitute, to wave at cars or to talk to passing motorists with such a purpose in mind; the crime defined in section 22–2701 consists of taking the further step of offering to engage in sex for a fee. To prove that, the government had to present evidence of what Blair actually said, not what she probably intended to say, which is all that Papaj's testimony showed.

This is not to say that expert testimony is inadmissible in all solicitation cases. It may well be that in another case such testimony would be sufficiently probative to be admissible. Testimony about the *modus operandi* of prostitutes, for example, might corroborate an undercover officer's testimony that he was solicited or rebut defense evidence by explaining otherwise ambiguous conduct. *See Harris v. United States,* 489 A.2d 464, 471 (D.C.1985) (expert testimony about the *modus operandi* of drug dealers held admissible because it "tended to corroborate the other officers' testimony that the transaction between Officer Smith and appellant in fact involved

possession of a controlled substance"). In this case, however, we hold that Detective Papaj's testimony was not probative of any material fact that had not already been established by other evidence.[13] We therefore conclude that it was erroneously admitted. *Lampkins v. United States, supra.*

## VI. CONCLUSION

■ Ordinarily, in reversing a conviction because of some erroneous action by the trial court, we remand the case for a new trial. When the reversal is based on the insufficiency of the evidence, however, a new trial is not permitted. In *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), the Supreme Court drew a distinction "between reversals due to trial error and those resulting from evidentiary insufficiency." *Id.* at 15, 98 S.Ct. at 2149. In the latter instance the Double Jeopardy Clause of the Fifth Amendment precludes a second trial; "the only 'just' remedy available for [this] court is the direction of a judgment of acquittal." *Id.* at 18, 98 S.Ct. at 2151. This holding was reaffirmed a few years later in *Richardson v. United States,* 468 U.S. 317, 323, 104 S.Ct. 3081, 3084, 82 L.Ed.2d 242 (1984). For double jeopardy purposes, "an appellate court's finding of insufficient evidence to convict on appeal from a judgment of conviction is ... the equivalent of an acquittal," barring retrial. *Id.* at 325, 104 S.Ct. at 3086.

In these cases we are reversing all five convictions on the ground that the evidence was insufficient to sustain any of them. Because *Burks* and *Richardson* dictate that none of them can be retried, we remand these cases to the trial court with directions to enter a judgment of acquittal in each case.[14]

*Reversed and remanded with directions.*

---

13. Although we need not decide the point, we assume that Officer Heilizer's testimony describing Blair's conduct and recounting the words he heard her say was sufficient to prove the first three elements of the offense as set forth in *Graves, supra,* 515 A.2d at 1145. If there were any doubt about that, it would be dispelled by Blair's own admission on the witness stand that she "had been a prostitute in the area for years." But neither Heilizer's nor Blair's testimony established the crucial fourth element: that *on the*

evening of May 28 Blair offered to engage in sexual acts with another person "in return for a fee." On this point Papaj's testimony was of no help at all to the trier of fact because he knew no more than the judge knew about the events of May 28.

14. In the *Blair* case, there is an additional ground for reversal in the erroneous admission of the expert testimony of Detective Papaj. We emphasize, however, that with or without that

NEBEKER, Associate Judge, Retired, dissenting, with whom Chief Judge PRYOR and Associate Judges BELSON and STEADMAN concur:

We are concerned with an atypical amendment to an old statute. However, we are not really concerned with its meaning, for it is nearly meaningless. It is first appropriate to ask: what additional conduct does the amendment proscribe? The answer is nothing. That is why the amendment is a strange one. It says it proscribes, *inter alia,* stopping or attempting to stop motor vehicles or passers-by "for the purpose of prostitution." But every act the amendment addresses was already covered by the original proscription of inviting, enticing, persuading or addressing for those purposes "for the purposes of prostitution."

The purpose in amending the statute seems obvious in historical context. Before the addition, soliciting for prostitution was proved by direct testimony of a verbal encounter between a covert operative and the defendant. The conversation touched all elements of the offense. No case has held that such proof is the only way to prove the offense under our statute. The fact is that until recently the enforcement method was limited to verbal encounters. The purpose of the amendment was to make enforcement of the statute more efficient than the previous "one-on-one" conversational method.

In the amendment, the Council suggests the offense can be proven by observations of conduct. No elements have been added or removed for proof of the offense. Therefore, the meaning of the statute remains as it was—to prohibit "solicitations" of sexual acts for a fee. Whether proof of conduct is enough is really a constitutional question of due process, *i.e.,* sufficiency of the evidence. *See In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

In these cases the theory of the prosecution (perhaps prompted by the addition to the statute) is that the elements of the offense can be proven by circumstantial evidence and reasonable inferences. The circumstantial evidence in these cases, in my view, is compelling. It is just like proof beyond a reasonable doubt where possession of recently stolen property proves the theft act, such as robbery, burglary or larceny, etc., or where identity, intent, or other state of mind may be proved from objective conduct or proof of prior knowledge or experience. The process is a familiar one of fact determination by deductive reasoning, *i.e.,* a specific determination derived by general, objective data. Thus, these cases become easy of decision. The question is: does the testimony permit inferences relative to the elements of the offense which are sufficiently likely or reasonable for proof beyond a reasonable doubt? Those in the majority say "no" but do not say why. They do not say how inferences can be drawn from circumstantial evidence in so many other offenses, but not as to the fee element here. They do, however, allow as to how it may be inferred that these women were advertising their sexual availability.

The majority spends many words justifying why some of them were right on a division when they held observations to be insufficient proof (*ante* at 624–625). This is hardly necessary since the en banc court may do as it wishes, subject only to the dictates of common sense if it wishes to decide credibly.

In its last paragraph on the sufficiency issue (*ante* at 625), the majority readily admits that these women "looked and ... acted like prostitutes." I take it they must mean purveyors of sex in exchange for something of value. But then the majority says their actions were ambiguous without "further proof" of financial consideration. Such a statement is a delightful nod to common sense in that it admits that some inference of sex for a fee is reasonable on this proof. Then comes our unrealistic holding: "Because there was no evidence" of a fee for the inferred "sexual availability," their convictions must be reversed. The inconsistency in reasoning is obvious. We have now indulged in an impermissible hypothesis of innocence, and a laughable

testimony the evidence in *Blair* was insufficient, so that *Burks* and *Richardson* preclude a retrial.

one at that. Given the majority's enlightened willingness to agree that sex acts by prostitutes were the purposes of the observed actions, they then inexplicably hold that absent further proof concerning fee the prostitute must be presumed to have offered sex as a gift of gratification. To do so under the facts of these cases is to affect ignorance of "the world's oldest profession."

Furthermore, the majority departs from the understandable when it says that the government must prove "the substance of the exchange between the defendant and another person" and that "there must at least be evidence of a communication, verbal or nonverbal, between the defendant and the other person and some proof that the contents of that communication is within the proscription of the statute." Nor do I understand the further statement that "the illegality lies in the communication itself, not in the conduct leading up to it."

These comments fly squarely in the face of the language of the statute with its 1981 amendments. The statute does not proscribe "offering to engage in sexual acts or contacts with another person for a fee," as the quoted comments would suggest. That concept is contained in the definition of "prostitution" itself, which includes not only engaging in sex for pay but also "offering to engage" in such acts. What the statute proscribes is "inviting, enticing, or persuading, or addressing ... for the purpose of prostitution." And the proscribed acts include, among other things, "repeatedly attempting to stop ... passersby," or "attempting to stop motor vehicles" or "repeatedly interfering with the free passage of other persons."

None of these proscribed acts require any communication at all. Indeed, they are all lawful standing alone. What makes them unlawful under the statute is whether they are done "for the purpose of ... offering to engage in" sex for pay. Thus, it is the *intent* with which the proscribed acts are done that makes them lawful vel non. It is proof of unlawful intent—a familiar requirement of the law—that must be presented to sustain a conviction. And under familiar principles, proof of intent is almost invariably circumstantial. I would hold the evidence to be sufficient in each case, as, indeed, have many states. *See Ford v. United States*, 498 A.2d 1135, 1139-40 (D.C.1985).

Given that the majority has now destroyed the observation method of enforcing the statute, it is understandable that it holds the use of the expert's testimony in the *Blair* case, to be "not probative of any material fact that had not already been established by other evidence." To do otherwise would make the insufficiency-of-the-evidence holding bootless.

The majority agrees that this testimony proves behavior of a prostitute and even that the woman "was in fact a prostitute." (*Ante* at 626.) Now we know that a prostitute provides her body for sex for a fee. That is precisely what the expert testified —that the conduct showed she was "trying to get a date," meaning "[h]ave sex for money." Why then is it not apparent that the woman—a prostitute acting as a prostitute—was seeking to "have sex for money." The majority says not, but the witness opined that is what she was doing. His testimony was patently "adequate" to prove the fee element. At least we do not hold that expert testimony on this subject is always inadmissible.

I vote to affirm the convictions.